IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,267

LUKE GANNON, BY HIS NEXT FRIENDS AND GUARDIANS, *et al.*,
*Appellees*,

v.

STATE OF KANSAS,
*Appellant.*

SYLLABUS BY THE COURT

1.

A party asserting compliance with a court decision ordering remedial action bears the burden of establishing such compliance.

2.

To determine legislative compliance with the adequacy requirement in Article 6 of the Kansas Constitution, Kansas courts apply the test from *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186 (Ky. 1989), which establishes minimum standards for providing adequate education. More specifically, the adequacy requirement is met when the public education financing system provided by the legislature for grades K-12—through structure and implementation—is reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose* and presently codified in K.S.A. 2016 Supp. 72-1127.

3.

Under the facts of this case, the State has not met its burden of establishing that the K-12 public education financing system the legislature enacted, *i.e.*, Senate Bill 19, is

1

reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186 (Ky. 1989).

4.

To determine compliance with the equity requirement in Article 6 of the Kansas Constitution, school districts must have reasonably equal access to substantially similar educational opportunity through similar tax effort. This is not a zero-tolerance test because equity is not necessarily the equivalent of equality.

5.

Under the facts of this case, the State has not met its burden of establishing that school districts have reasonably equal access to substantially similar educational opportunity through similar tax effort after Senate Bill 19 expanded the authorized uses of the capital outlay fund.

6.

Under the facts of this case, the State has not met its burden of establishing that school districts have reasonably equal access to substantially similar educational opportunity through similar tax effort by imposing different procedures for certain districts to raise their maximum Local Option Budget (LOB).

7.

Under the facts of this case, the State has not met its burden of establishing that school districts have reasonably equal access to substantially similar educational opportunity through similar tax effort after Senate Bill 19 changed the LOB equalization calculation.

8.

Under the facts of this case, the State has not met its burden of establishing that school districts have reasonably equal access to substantially similar educational opportunity through the at-risk funding procedures in Senate Bill 19.

Appeal from Shawnee District Court; FRANKLIN R. THEIS, ROBERT J. FLEMING, and JACK L. BURR, judges. Opinion filed October 2, 2017. The State has failed to show that the remedial legislation, Senate Bill 19, meets the adequacy and equity requirements of Article 6 of the Kansas Constitution.

*Stephen R. McAllister*, solicitor general, argued the cause, and *Jeffrey A. Chanay*, chief deputy attorney general, *M.J. Willoughby*, assistant attorney general, *Dwight R. Carswell*, assistant solicitor general, *Bryan C. Clark*, assistant solicitor general, and *Derek Schmidt*, attorney general, were with him on the briefs for appellant State of Kansas; *Arthur S. Chalmers* and *Jerry D. Hawkins*, of Hite, Fanning & Honeyman, LLP, of Wichita, were with him on the briefs for appellant State of Kansas; and *Jeffrey R. King*, special assistant attorney general, argued the cause for appellant State of Kansas.

*Alan L. Rupe*, of Lewis Brisbois Bisgaard & Smith LLP, of Wichita, argued the cause, and *Jessica L. Skladzien*, of the same firm, and *John S. Robb*, of Somers, Robb & Robb, of Newton, were with him on the briefs for appellees.

*Jeffrey R. King*, of Collins & Jones, P.C., of Overland Park, was on the brief for *amicus curiae* Legislative Coordinating Council.

PER CURIAM:  This is the fifth school finance decision involving these parties and Article 6 of the Kansas Constitution, which imposes a duty on the legislature to "make suitable provision for finance of the educational interests of the state." Kan. Const. art. 6, § 6(b). The plaintiffs filed suit in 2010 asserting that the State violated this constitutional requirement by inequitable and inadequate funding of K-12 public education. A three-judge panel determined in 2013 after a trial that through K.S.A. 72-6405 *et seq*. (School District Finance and Quality Performance Act or SDFQPA) the State had inequitably and inadequately funded education for years in violation of Article 6.

A series of other panel decisions, legislative enactments, and four decisions by this court followed. In the latest of those decisions, filed in March of this year, we held that the 2015 legislative replacement for a by-then-repealed SDFQPA—the Classroom Learning Assuring Student Success Act (CLASS)—was constitutionally inadequate in both structure and implementation. Evidence showed that not only was the State failing to provide approximately one-fourth of all its public school K-12 students with the basic skills of both reading and math, but that it was also leaving behind significant groups of harder-to-educate students. And substantial competent evidence showed that the student performance reflected in this evidence was related to funding levels. We stayed the issuance of our mandate to provide the legislature an opportunity to bring the state's education financing system into compliance with Article 6 of the Kansas Constitution, cautioning that any remedy should also comport with equity. *Gannon v. State*, 305 Kan. 850, 855-56, 390 P.3d 461 (2017) (*Gannon IV*). The legislature responded by passing Senate Bill 19.

We now face the following question:  Based upon the issues the parties brought before us, has the State met its burden of showing that this remedial legislation meets Article 6's adequacy and equity requirements? We hold the State has not. Even though S.B. 19 arguably makes positive strides, the state's public education financing system still has not been shown by the State to be "reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose* [*v. Council for Better Educ., Inc.*, 790 S.W.2d 186 (Ky. 1989)] and presently codified in K.S.A. 201[6] Supp. 72-1127." *Gannon v. State*, 298 Kan. 1107, 1170, 319 P.3d 1196 (2014) (*Gannon I*) (articulating the test for adequacy). Additionally, that system, through its structure and implementation, is not providing school districts with "reasonably equal access to substantially similar educational opportunity through similar tax effort." 298 Kan. at 1175 (articulating the test for equity).

4

Given these conclusions, we next consider remedy. As we acknowledged in *Gannon IV*, "Our general practice with previous school finance decisions has been to retain jurisdiction and continue to stay . . . our own mandate to provide the legislature an opportunity to bring the state's education financing system into compliance with Article 6 of the Kansas Constitution. [Citations omitted.]" 305 Kan. at 856. We essentially continue that practice today for the same reasons cited in *Gannon IV*, *i.e.*, because the State has twice demonstrated its ability to cure constitutional infirmities recognized by this court in the school finance system. 305 Kan. at 856; see *Montoy v. State*, 282 Kan. 9, 24-25, 138 P.3d 755 (2006) (*Montoy IV*) (legislature's efforts in 2005 and 2006 constitute substantial compliance with prior orders; appeal dismissed); *Gannon v. State*, No. 113,267 (order dated June 28, 2016) (unpublished) (finding legislation cured equity constitutional infirmities in *Gannon* litigation for the 2016-2017 school year).

Once legislation is enacted, the State will have to satisfactorily demonstrate to this court by June 30, 2018, that its proposed remedy brings the state's education financing system into compliance with Article 6 of the Kansas Constitution regarding the violations identified, *i.e.*, both adequacy and equity. For those purposes, the State will continue to bear the burden of establishing such compliance and explaining its rationales for the choices made to achieve it. 305 Kan. at 856 (citing *Gannon v. State*, 303 Kan. 682, 709, 368 P.3d 1024 [2016] [*Gannon II*], which held that the party asserting compliance with a court decision ordering remedial action bears the burden of establishing that compliance).

Staying the issuance of our mandate until June 30 is consistent with our general practice. But we also "must heed our duty to ensure Kansas students receive the education system guaranteed them by the Constitution." *Gannon II*, 303 Kan. at 744. Without counting today's decision, the education financing system has been judicially declared to be inadequately funded for at least 12 of the last 15 years—through school year 2016-2017. So after June 30, 2018, "'the demands of the Constitution cannot be further postponed.'" 303 Kan. at 744 (quoting *Edgewood Independent School Dist. v.*

5

*Kirby*, 804 S.W.2d 491, 498 [Tex. 1991]). We agree with the Wyoming Supreme Court: "'[S]taying the judicial hand in the face of continued violation of constitutional rights makes the courts vulnerable to becoming complicit actors in the deprivation of those rights.'" 303 Kan. at 739 (quoting *State v. Campbell County School Dist.*, 2001 WY 90, ¶ 33, 32 P.3d 325 [2001]).

The State will have ample time and opportunity, whether by regular legislative session, special session, or a combination thereof, to bring the system into constitutional compliance so that we can make such a judgment—by that date.

*Historical perspective*

The parties agree that the framework of S.B. 19 is essentially based on the SDFQPA that existed for approximately 23 years. Accordingly, it is helpful to revisit the history set forth in *Gannon IV*, 305 Kan. at 876-80, and supplement it with later developments.

U.S.D. No. 229

Since 1992, the SDFQPA had established the formula and mechanism through which most funds for K-12 public education were obtained by Kansas school districts. See *U.S.D. No. 229 v. State*, 256 Kan. 232, 275, 885 P.2d 1170 (1994) (upholding the constitutionality of SDFQPA as originally enacted and implemented). The formula provided a fixed amount of funding for each student through "base state aid per pupil," also known as BSAPP. A district's full-time equivalent enrollment was adjusted by adding various weightings based on the proven recognition that the needs of some students require more resources for their education than others. These included such things as low enrollment, special education, vocational, bilingual education, and at-risk student weighting factors, which added funds for those needs. Once a school district's

6

enrollment was adjusted per the weightings, that figure was multiplied by the BSAPP. The resulting product was the amount of state financial aid to which the school district was entitled.

Funding for the BSAPP was derived from two sources: local effort and state financial aid. The majority of school districts' local effort consisted of property tax funds, as each district was statutorily required to impose a mill levy—20 mills per K.S.A. 2016 Supp. 72-6470—upon taxable tangible property in its territory. Because property values vary widely throughout the state, the amount of money each district could raise by the required mill levy also varied widely. So the State provided additional funds to less wealthy districts through "general state aid."

If a district's local effort funds equaled its state financial aid entitlements, it received no additional money from the State, *i.e.*, general state aid. And if a district's local effort funds exceeded its state financial aid entitlement, the excess was remitted to the State. For those districts qualifying for general state aid, their amount was what remained after subtracting their local effort funds from their state financial aid entitlement.

Local effort and state financial aid—as calculated using BSAPP and enrollments—comprised most of the funds available for K-12 education. But school districts could access additional funds in several ways.

First, a local school board could impose an additional mill levy on property in its district to fund a local option budget (LOB) to augment the funds that were distributed through the BSAPP. The revenues produced by the LOB mill levy could not exceed an amount equal to a set percentage or "cap"—historically as low as 25%—of a district's state financial aid. K.S.A. 72-6433(b)(9)(B). After application of a statutory formula, in

order to account for differences in property wealth among the districts, the less wealthy ones could also qualify for, and receive from the State, "supplemental general state aid."

Second, a local board could also impose an additional mill levy on property in its district to fund capital outlay expenses such as purchasing certain equipment. After application of a statutory formula, the less wealthy districts could also qualify for, and receive from the State, "school district capital outlay state aid."

In *U.S.D. No. 229*, both the trial court and this court scrutinized the various components of the SDFQPA, described by this court as "arguably, the most significant single piece of legislation ever enacted by the Kansas Legislature in terms of the amount of tax dollars involved and its impact on the citizens of Kansas." 256 Kan. at 236. This court concluded that the legislative record demonstrated a justification for each component of the SDFQPA. 256 Kan. at 266-68.

Montoy

The structure of the SDFQPA as originally challenged by the *Gannon* plaintiffs had been modified in response to our holdings arising from litigation in *Montoy v. State.* These are: *Montoy v. State*, 275 Kan. 145, 62 P.3d 228 (2003) (*Montoy I*); *Montoy v. State*, 278 Kan. 769, 120 P.3d 306 (2005) (*Montoy II*); *Montoy v. State*, 279 Kan. 817, 112 P.3d 923 (2005) (*Montoy III*); and *Montoy IV*, 282 Kan. 9.

This litigation acknowledged that the BSAPP when the SDFQPA was first implemented in 1992 was $3,600. *Montoy III*, 279 Kan. at 830. The State gradually increased BSAPP through small yearly increments until it reached $3,890 in 2002. At that time, the legislature had the results of a cost study it had commissioned by Augenblick and Myers (A & M), which proposed the state implement a BSAPP of $4,650 for 2001. 279 Kan. at 830. After our decision in *Montoy II*, the 2005 legislature

responded by increasing BSAPP from $3,890 to $4,222 through a $63.3 million increase in state funding. 279 Kan. at 830.

We found this response to be inadequate. *Montoy III*, 279 Kan. at 845-46. During a special session called later that same month, the legislature timely amended the formula and provided a funding increase totaling $289 million for the 2005-2006 school year. See *Montoy IV*, 282 Kan. at 14. This amount represented one-third of the amount proposed by the A & M study, which had been previously disregarded by the State. But, as we later explained in *Gannon I*, full funding of this study's recommended amount was not necessarily required for constitutional compliance. 298 Kan. at 1170. In an unpublished order of July 8, this court held those amendments complied with *Montoy III* for "interim purposes" but retained jurisdiction to view any additional legislation passed by the 2006 legislature. *Montoy IV*, 282 Kan. at 15.

While *Montoy* was pending, the legislature not only had the results of the A & M study but it also directed the Legislative Division of Post Audit (LPA) to "conduct a professional cost study analysis to estimate the costs of providing programs and services required by law." K.S.A. 2005 Supp. 46-1131(a). The applicable law included "(1) State statute; and (2) rules and regulations or standards relating to student performance outcomes adopted by the state board" of education. K.S.A. 2005 Supp. 46-1131(b). These statutes included K.S.A. 2005 Supp. 72-1127, which required the State Board of Education (SBE) to design performance outcome standards to achieve the educational goals newly established by the 2005 legislature in subsection (c). In *Gannon I*, we later described the goals in 72-1127 as "remarkably parallel[]" to the *Rose* standards. 298 Kan. at 1166-67.

In response to our *Montoy III* decision as well as the results of the LPA study, in 2006 the State increased education funding by $466.2 million to be stretched over the upcoming three years, which, when combined with the previous increases, would total

9

$755.6 million. This funding increase included raising the BSAPP for fiscal year 2007 from $4,257 to $4,316; to $4,374 for fiscal year 2008; and up to $4,433 for fiscal year 2009. *Montoy IV*, 282 Kan. at 17-18.

Given these statutory provisions, we held that the new funding system constituted substantial compliance with our prior orders, so we dismissed the *Montoy* litigation. In relinquishing jurisdiction, we recognized that because the State's new funding provisions constituted a three-year plan it "may take some time before the full financial impact of the new legislation [was] known, a factor which would be important in any consideration of whether it provide[d] constitutionally suitable funding." *Montoy IV*, 282 Kan. at 26.

Less than three years after *Montoy* was dismissed, the State began making significant cuts to Kansas' education funding, initially in response to the national economic downturn. In fiscal year 2009 the BSAPP appropriation was reduced from the 2006 legislature's statutorily specified amount of $4,443 to $4,400. And although the 2009 legislature had initially established BSAPP at $4,492 for fiscal year 2010 and beyond, the actual appropriation for fiscal year 2010 was reduced to $4,012—a difference of $480 per pupil.

After *Gannon* was filed in November 2010, legislative reductions in BSAPP-calculated spending continued. By fiscal year 2012—that began July 1, 2011, and ended June 30, 2012—the legislature had reduced BSAPP to $3,780. In total, the reduction to education funding through these BSAPP reductions constituted a loss of more than $511 million to local districts. *Gannon I*, 298 Kan. at 1114-15. Based upon this and other evidence, the panel concluded in its January 2013 decision that the legislature underfunded K-12 public education between fiscal years 2009 and 2012. 298 Kan. at 1110. It also concluded the State had violated the equity requirement by eliminating capital outlay state aid and prorating supplemental general state aid payments to which

some less-wealthy school districts were otherwise entitled by statute. 298 Kan. at 1181, 1188.

In *Gannon I*, we affirmed the panel on equity and remanded for it to make determinations in the remedial phase. 298 Kan. at 1111. After its decisions, we resolved the equity issue through a series of decisions and orders followed by a special session of the legislature in June 2016 that produced additional school finance legislation and appropriations. We ultimately held that for the 2016-2017 school year, the legislative response cured the constitutional inequities identified in our previous decisions. *Gannon*, No. 113,267 (order dated June 28, 2016) (unpublished).

In *Gannon I* we also tasked the panel on remand with making an adequacy determination after applying our more clearly defined *Rose*-based test to the facts. 298 Kan. at 1171. The panel issued several rulings which, combined with its earlier decision, declared that the financing under the SDFQPA from fiscal year 2009 through fiscal year 2015 was constitutionally inadequate under the *Gannon I* test. Soon thereafter the 2015 legislature enacted CLASS, which repealed and replaced the SDFQPA. CLASS essentially froze funding levels for fiscal years 2016 and 2017 at the fiscal year 2015 level until that law expired on June 30, 2017. The panel later declared CLASS unconstitutional for substantially the same reasons it earlier had declared the SDFQPA unconstitutional. *Gannon IV*, 305 Kan. at 854.

On March 2, 2017, in *Gannon IV*, we affirmed the panel's holding that CLASS was constitutionally inadequate. CLASS did not meet the structure or implementation requirement contained in the *Gannon I* test. 305 Kan. at 855. En route to that conclusion we specifically affirmed that for the two years CLASS was in existence—fiscal year 2016 and fiscal year 2017—the funding was inadequate and that substantial numbers of Kansas students were performing below their grade level:

11

> "[A]t a minimum, the results on various standardized tests reveal that an achievement gap, or proficiency gap, found by the panel to exist between 'all students' and certain subgroups persists as of school year 2015-2016. And the numbers of all students failing to reach proficiency in core subjects each year continue to be significant." *Gannon IV*, 305 Kan. at 913.

We further agreed with the panel that more money was needed. 305 Kan. at 913-14.

In response, three and a half months later in June 2017 the legislature enacted and the governor signed S.B. 19. See L. 2017, ch. 95.

*S.B. 19*

S.B. 19 includes appropriations, several revenue raising features, and a formula for distributing money. It also contains laws impacting education policy.

The centerpiece of S.B. 19 is the new Kansas School Equity and Enhancement Act (KSEEA), which establishes the formula through which most K-12 public education funds are obtained by Kansas school districts. L. 2017, ch. 95, §§ 3-48. But S.B. 19 also amends certain statutes, including the capital outlay provisions, K.S.A. 72-8801 *et seq.*; the Virtual School Act, K.S.A. 2016 Supp. 72-3711 *et seq.*; the Special Education for Exceptional Children Act, K.S.A. 72-961 *et seq.*; and the Tax Credit for Low Income Students Scholarship Program Act, K.S.A. 2016 Supp. 72-99a01 *et seq.* The issues on appeal mainly involve the KSEEA and capital outlay laws.

The KSEEA contains the same basic finance formula and revenue streams as the SDFQPA immediately prior to its repeal—although some terminology is different. It utilizes a funding system in which some of the money used to fund basic operating

12

expenses comes from the "total foundation aid" calculation, *i.e.*, the formula, and some monies come from the LOB. L. 2017, ch. 95, §§ 4, 15.

Total foundation aid—known as state financial aid under the SDFQPA—is determined by a formula which provides a fixed amount of funding per student. Called the "'Base aid for student excellence'" or "'BASE aid'" under S.B. 19, it was known as base state aid per pupil, or BSAPP, under the SDFQPA. L. 2017, ch. 95, § 4(e). Total foundation aid equals the BASE multiplied by the district's enrollment as adjusted by the same weightings used under the SDFQPA to reflect that some students require more resources or that some districts have factors that increase costs. L. 2017, ch. 95, § 4(jj). Compare L. 2017, ch. 95, § 4(a) with K.S.A. 2014 Supp. 72-6407(f). The KSEEA also imposes the same mandatory 20-mill levy on each district's taxable tangible property. Compare L. 2017, ch. 95, § 14 with K.S.A. 2014 Supp. 72-6431. But all 20 mills are remitted to the State. L. 2017, ch. 95, § 14(c).

The BASE for school year 2017-2018 is $4,006 and for school year 2018-2019 is $4,128. Each year thereafter, the BASE is adjusted for inflation. L. 2017, ch. 95, § 4(e). The Kansas State Department of Education (KSDE) estimates the inflation adjustment will add $62 to the BASE in 2019-2020, raising it to $4,190.

As with the SDFQPA, school districts can still impose an additional mill levy on district property to fund an LOB. Compare L. 2017, ch. 95, § 15 with K.S.A. 2014 Supp. 72-6433. But the state prescribed percentage—the statutory cap on the revenues it produces—is set at 33% of the school district's total foundation aid. L. 2017, ch. 95, § 15(k)(2). As under the SDFQPA, less wealthy districts still qualify for supplemental state aid to account for varying property wealth among the districts, and S.B. 19 generally readopts the same aid formula approved by this court. See L. 2017, ch. 95, § 17; *Gannon IV*, 305 Kan. at 878.

Districts can also still impose an additional levy of up to 8 mills for capital outlay expenses. L. 2017, ch. 95, § 89. And S.B. 19 readopts the same aid formula to equalize capital outlay funding between wealthy and poor districts that this court approved in *Gannon v. State*, 304 Kan. 490, 503, 372 P.3d 1181 (2016) (*Gannon III*) (for computing "school district capital outlay state aid"). L. 2017, ch. 95, § 50.

Additional details regarding S.B. 19's provisions are included as necessary below.

## ANALYSIS

## ADEQUACY (ON THE MERITS)

ISSUE 1: *The State has not met its burden of establishing that the public education financing system provided by the legislature through S.B. 19 for grades K-12 meets Article 6's adequacy requirements.*

*Introduction*

The State contends that through S.B. 19 it has reached constitutional compliance on adequacy. Specifically, S.B. 19 provides a BASE—the counterpart to the BSAPP of the former SDFQPA—of $4,006 per pupil for fiscal year 2018 (that began July 1, 2017), which is an increase of $154 from the BSAPP amount of $3,852 for fiscal years 2015 through 2017. When multiplied by the number of students, this contributes the bulk of the $194 million in the total "new money," *i.e.*, the funding increase from fiscal year 2017. It also provides a BASE of $4,128 per pupil for fiscal year 2019, which contributes most of the approximately $97 million in new money for that fiscal year. BASE is to be adjusted annually thereafter by the average percentage increase in the consumer price index for all urban consumers in the Midwest region during the three immediately preceding years. L. 2017, ch. 95, § 4(e).

14

For those two fiscal years, the total amount of money exceeding the fiscal year 2017 funding is approximately $292.5 million. The plaintiffs respond that these amounts are not constitutionally adequate.

*Standard of review and burden of proof*

Our standard of review for adequacy was clearly set forth in *Gannon IV*:

"Whether through structure and implementation the K-12 system is reasonably calculated to have all public education students meet or exceed the *Rose* standards presents a mixed question of fact and law. When an appellate court reviews these mixed questions, it applies a bifurcated standard of review. Insofar as any of the panel's factual findings are in dispute, the court applies a substantial competent evidence standard. 'Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion.' *Gannon v. State*, 298 Kan. 1107, 1175, 319 P.3d 1196 (2014) (*Gannon I*).

"In determining whether substantial competent evidence supports the district court's findings, appellate courts must accept as true the evidence and all the reasonable inferences drawn from the evidence which support the district court's findings and must disregard any conflicting evidence or other inferences that might be drawn from it. *Gannon I*, 298 Kan. at 1175-76 (citing *Unruh v. Purina Mills*, 289 Kan. 1185, 1195-96, 221 P.3d 1130 [2009]). Accordingly, appellate courts do not reweigh the evidence or assess the credibility of witnesses. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014).

"The panel's conclusions of law based on those findings are subject to our unlimited review. 298 Kan. at 1176, 1182. The ultimate determination of whether the legislature is in compliance with Article 6, § 6(b) of the Kansas Constitution is a question of law. See *State v. Laturner*, 289 Kan. 727, 735, 218 P.3d 23 (2009) (constitutionality of

15

statutes presents question of law over which Supreme Court exercises unlimited review)." *Gannon IV*, 305 Kan. at 880-81.

Additionally, as they did in *Gannon IV*, the parties have agreed this court may again take judicial notice of appropriate matters in the public record, even those not considered by the panel. 305 Kan. at 871-72; see K.S.A. 60-409(b) (allowing judicial notice of statistics maintained in the records of a state department); K.S.A. 60-412(c) (reviewing court in its discretion may take judicial notice of any matter specified in K.S.A. 60-409 whether or not judicially noticed by the lower court).

As for the burden of proof, it remains with the State, as we stated in *Gannon IV* regarding the State's future efforts to replace CLASS that was due to expire on June 30, 2017:

> "Once a new financing system is enacted, the State will have to satisfactorily demonstrate to this court by June 30, 2017, that its proposed remedy is reasonably calculated to address the constitutional violations identified, as well as comports with previously identified constitutional mandates such as equity. [Citation omitted.]

> "For those purposes, the State will bear the burden of establishing such compliance and explaining its rationales for the choices made to achieve it. See *Gannon II*, 303 Kan. at 709 (party asserting compliance with court decision ordering remedial action bears burden of establishing that compliance)." *Gannon IV*, 305 Kan. at 856.

We confirmed the State's burden of proving compliance in our June 19, 2017, Order establishing briefing deadlines and oral arguments in this matter.

As further explained below, in addition to our again taking judicial notice of appropriate facts, we previously held that the panel's findings of fact were supported by substantial competent evidence. *Gannon IV*, 305 Kan. at 881. And we independently

16

conclude that the State has failed to meet its burden of demonstrating constitutional adequacy. We express no conclusions regarding S.B. 19 provisions not raised by the parties as issues on appeal.

*Discussion*

*Threshold determinations*

We begin our analysis by again recognizing that the legislature has the power—and duty—to create a school funding system that complies with Article 6 of the Kansas Constitution. *Gannon I*, 298 Kan. at 1146-47 (language of Article 6 both empowers and obligates the legislature to make suitable provision for finance of the educational interests of the State). We explained that Article 6, § 6(b) contained minimum standards of adequacy which are met when the financing system provided by the legislature for grades K-12—through structure and implementation—is reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose*. 298 Kan. at 1170. The *Rose* court held that:

> "[A] . . . system of education must have as its goal to provide each and every child with at least the seven following capacities:  (i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable the student to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market." 790 S.W.2d at 212.

17

These are minimum standards codified by our legislature as educational goals since 2005, K.S.A. 2005 Supp. 72-1127, and presently codified in K.S.A. 2016 Supp. 72-1127. *Gannon IV*, 305 Kan. at 864; *Gannon I*, 298 Kan. at 1166-67, 1170. And in S.B. 19, the legislature has openly declared its intention to meet them. "It is the purpose and intention of the legislature to provide a financing system for the education of kindergarten and grades one through 12 which provides students with the capacities set forth in K.S.A. 2016 Supp. 72-1127." L. 2017, ch. 95, § 70.

> *Plaintiffs' specific claims about how S.B. 19's structure is unconstitutional are rejected.*

Because plaintiffs acknowledge that S.B. 19 is very similar to the version of the SDFQPA that the legislature repealed, they do not challenge the overall structure as violating Article 6. Rather, they argue the failure to fund three statutory requirements renders S.B. 19's structure unconstitutional. Plaintiffs also argue that the 2017 legislature's tax bill, Senate Bill 30 (2017), will be inadequate to fund schools by fiscal year 2021. See L. 2017, ch. 84. They further raise concerns that future legislative bodies could refuse to raise the BASE amount for inflation as required by S.B. 19. L. 2017, ch. 95, § 4(e).

Recent history lends some credence to plaintiffs' arguments regarding sufficient state revenue and the possibility that the inflation adjustment will not be funded if revenue falls short. See *Gannon I*, 298 Kan. at 1114 (summarizing reductions in education funding due to falling state revenue). But these doubts involve too many contingencies and require us to make too many assumptions. Instead, we address the statutory requirements that plaintiffs challenge. Overall, we hold the sections of S.B. 19 challenged by plaintiffs satisfy the structure prong of our test for adequacy under Article 6.

*The failure to fully fund statutory entitlements does not implicate structure.*

Plaintiffs argue S.B. 19 is structurally unsound because the legislature did not actually appropriate full funding of three statutory entitlements: (1) special education aid, (2) the professional development program, and (3) the mentor teacher program. This argument can be summarily rejected for the mentor teacher and professional development programs because neither statute guarantees their funding, *i.e.*, they do not relate to structure. See K.S.A. 2016 Supp. 72-9608 (professional development state funds permitted "within the limits of appropriations"); L. 2017, ch. 95, § 63 (mentor teacher program grants are subject to available appropriations). The special education funding, however, requires a closer look.

Consistent with prior law, S.B. 19 authorizes special education reimbursement at 92% of excess costs which are defined as the amount over and above the average cost of educating a student who is not receiving special education services. The statute's plain language does not limit funding to the amount actually appropriated. It provides: "The computed amount is the amount of state aid for the provision of special education and related services aid a school district is entitled to receive for the ensuing school year." L. 2017, ch. 95, § 60(a).

S.B. 19 provides $12 million more per year than the prior law for a total of 24 million additional special education dollars. But this appropriation falls short of what SBE estimates will be required to reimburse at 92%. Plaintiffs argue the reduction of special education state aid forces districts to cannibalize other funding to cover the state and federal special education requirements. They analogize it to the prorated appropriation of supplemental general state aid traditionally used to equalize LOB funding that we held was unconstitutional in *Gannon I*, 298 Kan. at 1182-89.

19

There, this court held that the proration of such aid created unreasonable wealth-based disparities between school districts and was therefore inequitable. Special education aid is not analogous, however, because it is not used to equalize funding.

Plaintiffs' argument may be relevant to whether overall funding is adequate. But we conclude the mere underfunding of special education aid does not itself render S.B. 19 structurally inadequate.

*The State has not demonstrated S.B. 19's implementation meets the adequacy requirements of Article 6.*

*Overall funding*

The State not only has the burden to show compliance in this remedy phase and to explain its rationales for the choices made to achieve compliance, but toward that end we have stated the State would help its case by "'showing its work.'" See *Gannon III*, 304 Kan. at 500. Consequently, the State submits its model and accompanying formula for how it arrived at its financial figures. As submitted to this court, the State primarily relies upon a 4-page memo from the Kansas Legislative Research Department (KLRD) dated May 12, 2017, as presented that day to the Senate Select Committee on Education Finance. The memo contains a page and a half of text and attaches four graphs. KLRD memo to Senate Select Committee on Education Finance, http://kslegislature.org/li/b2017_18/committees/ctte_spc_select_committee_on_education_finance_1/documents/testimony/20170512_02.pdf.

According to the State, it utilized what it described as a "successful schools model" to determine the greater part of the $292.5 million. It correctly points out a similarly labeled "successful schools model" was one of the two models used in the

20

A & M study ordered by the legislature and prepared for the Kansas Legislative Coordinating Council. As A & M described:

> "The successful school (district) approach . . . seek[s] to infer a base cost figure from the actual spending of school districts, or schools, *determined to be successful because they meet whatever standards are used by a state to evaluate student and school performance*. Using this approach, a set of schools or school districts are selected from among all schools or districts that meet a variety of criteria related to their level of success in meeting state standards, their normalcy in terms of socio-economic characteristics such as district wealth or proportion of pupils from low income families, and their efficiency in terms of spending. Once districts have been selected, their basic spending (excluding spending for capital purposes, transportation, special education, other special programs, and any service funded by federal revenue) is examined to determine a base cost level." (Emphasis added.) A & M, p. I-3.

The A & M study explained the heart of this approach:

> "The successful school district approach is based on the simple premise that any district should be able to be *as successful at meeting a set of objectives as those schools that actually meet those objectives* provided that every district has the same level of funding that has been available to the successful districts, and that differences in student characteristics have been taken into consideration." (Emphasis added.) A & M, p. II-2.

The State and amicus curiae Legislative Coordinating Council argue that by applying various criteria, the KLRD was able to identify the 41 "most successful school districts" in Kansas, *i.e.*, those they describe as "exceed[ing] their expected performance by the greatest levels." Per the KLRD's May 12, 2017, memo, the first step in making this determination was to measure students' performance by four criteria:

(1) percentage of students at grade level in math and English Language Arts (ELA), *e.g.*, reading;

(2) percentage of students at college and career ready level in math and ELA;

21

(3) students' average composite ACT score; and

(4) the four-year high school graduation rate.

This first step is seemingly consistent with the typical use of this model. See, *e.g.*, *Campaign for Fiscal Equity, Inc. v. State*, 8 N.Y.3d 14, 22, 828 N.Y.S.2d 235, 861 N.E.2d 50 (2006) (observing that three alternative student performance criteria were included in choosing the qualifying schools in the successful schools model). But we note the State does not identify the performance results it used from any of the districts, *e.g.*, district "X" had 90% of its students performing at grade level in both math and ELA. Nor does it identify the year, or years, from which its data was taken—or the sources.

Armed with this unidentified data, the State then plotted an unspecified number of districts on four graphs, one for each of the above-listed criteria—which served as the "Y" axis on the graph. The "X" axis was the same on each graph:  the percentage of students on free lunch under the National School Lunch Program "for every district with 500 or more students." We observe that while it appears only a sample of Kansas' several hundred districts is shown by dots on the graphs, neither the districts nor the member characteristics of the sample are identified.

According to the State, once the unspecified number of districts with unidentified demographic characteristics were each plotted by (1) its students' performance and (2) its percentage of students on free lunch, its "regression analysis" based on the scatterplots revealed a "line of best fit." The State contends that its regression analysis was "similar to that outlined" by State Education Commissioner Randy Watson in his presentation to the Senate Select Committee on Education Finance when "discussing successful schools that outperformed expected student outcomes." See Senate Select Committee on Education Finance, May 12, 2017, Meeting Minutes. We independently observe that one of the classical assumptions for regression analysis is ensuring "[t]he sample is representative of the population for the inference prediction." Gatsi & Gadzo, Introduction to Quantitative

22

Methods in Business (2016). But the lack of State-supplied specificity that we previously mentioned necessarily undermines whatever persuasive value the State's chosen sample and resultant "line of best fit" might have.

Despite these shortcomings, the State points to the KLRD memo to contend that once its line of best fit was determined, individual district performance results were predicted and then compared to their actual performance results:

> "[T]he formula [correlation between the two axes] associated with that line was used to determine [predict] the expected [performance] results of a district at any given percentage of students eligible for free lunch. The *actual* [performance] results of the districts were then compared to the *expected* [performance] results of districts with the same percentage of students eligible for free lunch." (Emphases added.) See KLRD memo, p. 1.

According to the State, its selected 41 districts were successful because they either "exceeded their expected results on all 4 measures" or had an "average scaled difference on all 4 measures" exceeding expected results by at least one standard deviation. KLRD memo, p. 1. However, the memo, the graphs, and the committee meeting minutes do not identify any of the other districts that were measured. And consistent with the KLRD's treatment of the 41 districts, no performance results—predicted or actual—are provided for these other districts either.

Once those 41 districts were selected, the KLRD proceeded to calculate the per weighted pupil base amount for each. The memo describes the first two steps:

> "The [1] sum of expenditures from the general fund, supplemental general fund [LOB], at-risk funds, and bilingual fund (excluding flow-through aid, transfers and transportation expenditures) was [2] divided by the weighted enrollment according to the

23

weightings recommended by the [2006] Legislative Division of Post Audit cost study." KLRD memo, p. 1.

For the KLRD's next step:

"This amount was then divided by 1.4, to account for the fact that local option budgets are approximately 40 percent of general fund budgets, to get to a per weighted pupil base amount." KLRD memo, p. 1.

The last step of the KLRD calculation was to determine an average:

"The average of those per weighted pupil base amounts of the identified schools was $4,080." KLRD memo, p. 1.

The plaintiffs criticize this approach for a number of reasons. In support of their arguments, they list the 41 districts and—unlike the State—for each one provide certain data for school year 2015-2016. The information comes either from the record on appeal or the KSDE website, which the court continues to judicially notice under K.S.A. 60-409 and K.S.A. 60-412. Several of their arguments will be addressed in turn.

The plaintiffs argue this is simply a recalculation of what these 41 chosen districts "were allowed to spend under a former formula that was unconstitutionally underfunded," which prevented the districts from spending the necessary amounts to meet the constitution's mandate. Toward that end, they argue the 41 districts are neither successful nor overachieving. "While these districts may outperform expectations, they do not pass constitutional muster." Many of the 41 "have high rates of students 'not on grade level' in either reading or math." See *Gannon IV*, 305 Kan. at 904 (The KSDE new testing standards group students into four achievement levels; the lowest is level one: "students who are not performing at grade level in the given subject."). Phrased another way,

24

plaintiffs basically argue that these districts are perhaps merely the best, or the most efficient, of the constitutionally inadequate.

As explained below, we agree based on the record before us that these 41 selected school districts have not been shown by the State to be appropriate candidates from which to extrapolate the costs of achieving the educational outcomes set out in *Gannon I*, 298 Kan. 1165-70. Simply put, merely performing "better than expected"—while perhaps a test for efficiency—is not our Kansas test for constitutional adequacy.

In *Gannon IV*, we held a system that fails to provide approximately one-fourth of all its public school K-12 students with the basic skills of both reading and math because of funding levels "is not reasonably calculated to have all Kansas public education students meet or exceed the minimum constitutional standards of adequacy." 305 Kan. at 855-56. In other words, such a system is unconstitutional. Here, 4 of 41 (10%) of the State's selected districts (Woodson, Chaparral, Coffeyville, and Independence) experienced 24.18% or more of their students performing below grade level in ELA. Two of the selected districts (Coffeyville and Salina) had more than 27% of their students performing below grade level in math. And as shown by the table below, many students in 22% of the selected districts—9 of the 41—perform well below grade level in *both* of these "subjects at the heart of an adequate education." 305 Kan. at 855.

| District Name | % Below grade level in ELA | % Below grade level in Math |
|---|---|---|
| Chaparral | 27.25 | 23.73 |
| Woodson | 24.79 | 19.42 |
| Coffeyville | 24.23 | 27.67 |
| Independence | 24.18 | 22.31 |
| Lyons | 22.91 | 23.77 |
| Salina | 22.29 | 27.89 |
| Chanute | 21.39 | 22.08 |
| Halstead | 20.05 | 21.11 |
| Parsons | 19.79 | 23.11 |

25

In total, 19% or more of the students in a number of the districts chosen by the State were performing below grade level: 14 of the districts in ELA and 14 of the districts in math. Considering overlap, in 19 of 41 (46%) of the selected districts at least 19% of the students were performing below grade level. Indeed, the averages of all these schools in the State's model reveal 16.65% of the students were below grade level in ELA and 16.64% were below grade level in math. These profiles raise doubt about why these districts can be included in the 41 selected by the State—a question the State does not attempt to answer.

The plaintiffs further point out that if the State's current successful schools formula had been applied to Wallace County—one of the 41 selected districts—in school year 2015-2016 it would have spent $4,690 as its base per pupil. Consistent with the plaintiffs' observation about Wallace County, we note that 26 of the 41 districts had to spend more base per pupil (per the State's self-described successful schools formula) than the $4,006 BASE allocated by the State for fiscal year 2018 through S.B. 19. Most troubling, last year 5 of these "overspending" 26 districts were already experiencing substantial percentages of students performing below grade level in both ELA and math.

| District and last year $ spent | % Below grade level in ELA | % Below grade level in Math |
|---|---|---|
| Chaparral: $4,209 | 27.25 | 23.73 |
| Woodson: $4,160 | 24.79 | 19.42 |
| Lyons: $4,211 | 22.91 | 23.77 |
| Halstead: $4,320 | 20.05 | 21.11 |
| Barnes: $4,504 | 19.40 | 18.51 |
| Average: $4,281 | 22.88 | 21.31 |

The State has failed to show that these 26 districts will remain "successful"—or more pertinent to the central issue, that they will be able to provide a constitutionally adequate education to their students—when for the present fiscal year their base funding has been cut for each student from anywhere between $7 (Waconda) and $684 (Wallace County). We have the same concern about constitutional adequacy for all those other

districts—who are not among the 41 successful schools—that also are experiencing base funding reductions. For as was established through the panel's findings in *Gannon IV*, "'money makes a difference' in public education." 305 Kan. at 900. Most on point here, the panel found that historically Kansas student achievement actually declined as funding decreased—a finding we affirmed as supported by substantial competent evidence. 305 Kan. at 892.

As a result, we are especially troubled by the special assistant attorney general's repeated requests at oral argument for this court to give the State "at least 2.5 to 3 years" to see how—or even whether—the new funding levels play out in a constitutionally adequate manner for the 286 school districts and approximately 500,000 students in our state. During the remedy phase the State has the burden to show constitutional compliance by demonstrating the validity of any methodology used in crafting a funding formula or arriving at funding amounts. But simply arguing that it hopes to show it will be compliant years from now does not meet that burden, especially when this litigation was filed in 2010.

Stated simply and starkly, the State's "successful schools" model does not contain enough schools or districts meeting student performance standards—much less constitutional standards of adequacy—to warrant that label. As was expressed in the LPA study of 2006 ordered by the legislature, the successful schools model is where "[r]esearchers identify a set of schools or school districts *that already meet a set of outcome standards*. These districts' spending is used to estimate what it would cost other districts *to achieve the desired outcomes*." (Emphases added.) The A & M study similarly explained: "The successful schools approach is most useful when the state has specified its objectives, and districts can be identified *that meet them on the basis of acceptable criteria*." (Emphasis added.) See also Rebell, *Safeguarding the Right to a Sound Basic Education in Times of Fiscal Constraint*, 75 Alb. L. Rev. 1855, 1958 (2012).

Deficiencies in the State's cost-estimating approach stem not only from the KLRD's virtually undisclosed review of the school districts but also from (1) the brevity of its resultant memo and attachments and (2) the timeliness of the presentation of those materials to a legislative body. With the passage of CLASS in March 2015, the legislature declared it would work on the replacement school finance formula and have it ready by June 30, 2017—the date the legislature chose for CLASS's expiration. 305 Kan. at 854. Yet the memo and its attachments—the full documentation of the cost-estimating approach we are asked to approve—apparently were not provided to the Senate Select Committee on Education Finance until May 12, 2017, and were never presented to the House K-12 Education Budget Committee. Sparse documentation resulted— documentation that raises more questions than it answers and provides no alternative explanation sufficient for the State to meet its burden.

The KLRD study's ostensibly short duration is in contrast to the A & M study, which lasted seven months, and the 2006 LPA study, which took approximately six months and was presented to the 2006 legislature on January 9, 2006—permitting thorough review during the entire legislative session. And while the KLRD work was represented by only four pages composed of memo and graphs, the A & M study, including attachments, was 166 pages in length. The LPA study, including attachments, was 343 pages: 114 pages of report text and more than 200 pages of appendices. Not surprisingly, we characterized these latter two studies as performing "exhaustive review of the state's school finance system." *Gannon IV*, 305 Kan. at 896. Consistent with the complexity of such studies, after the LPA study expressly rejected the successful schools model in favor of the cost function approach, it "hired consultants to perform *the sophisticated statistical techniques* involved in a cost function analysis that would estimate the cost of meeting the performance outcome standards adopted by the State Board of Education." (Emphasis added.)

Additionally, the State does not explain why the 2017 legislature chose to employ what it describes as a successful schools model when its LPA had expressly rejected the model in the 2006 report after reviewing the four basic approaches used in education research to estimate education costs and consulting with "a number of representatives of Kansas school districts, academic researchers, and staff from the National Conference of State Legislators." LPA study, p. 32. Similarly, the State does not explain why the legislature should now embrace this model when the State's own expert witness testified to the panel in disapproval of A & M's use of the model because it was not reliable, *i.e.*, it did "not answer the basic question, how much does it cost to achieve some given level of achievement."

Nevertheless, in support of the KLRD's recent use of its professed successful schools model, the State has now pointed out that the A & M study, at least in part, also used a successful schools model. The A & M study's actual use, however, provides a further—and sharp—contrast to the State's current approach.

The A & M study first used student test performance data from many school districts over two years to help identify successful schools. It then considered a separate analysis it had previously performed to study "spending efficiency." In other words, A & M "ran a regression analysis to see if a district's spending was in line with that of districts of similar size and characteristics." It considered the proportion of students from low income families, *i.e.*, free lunch qualifiers under federal law. Unlike the KLRD, it considered factors such as the size of attendance centers, enrollment, tax effort, and assessed value per pupil to determine how they affected spending and then used that information to predict the spending of each district.

After performing this regression analysis, A & M determined that 50 of the 85 schools chosen as successful would be considered "inefficient," *i.e.*, their "actual spending was higher than the predicted spending." So A & M did not apply this

29

efficiency factor in its search for successful schools: "Since the majority of successful districts would be considered inefficient spenders, we did not use this examination of efficiency."

Here, the State's model essentially stressed just the opposite. Instead of emphasizing success as measured by students' high test performance, it emphasized success based on a form of efficiency that was primarily, if not solely, measured by what the State considered to be those districts "exceed[ing] their expected performance by the greatest levels." Once the State learned how many of its selected districts—the 41 identified by its efficiency regression analysis—had significant percentages of students performing below grade level, if it did not eliminate efficiency as a factor like the A & M study did, it presumably should have at least reduced efficiency's dominant influence in its successful schools calculus. And at the very least, the State should have explained why the KLRD's approach validly rendered an outcome in line with the constitutional standard of adequacy—as A & M did when it not only provided extensive explanations but also cited academic research affirming the techniques it chose for performing its task.

In addition to addressing several of the plaintiffs' arguments and those described above, we independently note several problems with the mathematical path leading to the State's calculation of BASE at $4,080 for fiscal year 2018. As mentioned, the State's first step involved adding each of the 41 districts' expenditures from the general fund, supplemental general fund (LOB), at-risk funds, and bilingual fund (excluding flow-through aid, transfers, and transportation expenditures). This sum was then "divided by the weighted enrollment according to the weightings recommended by the [2006] Legislative Division of Post Audit cost study." But consistent with the State's overall lack of explanation, it fails to specifically explain why it included the at-risk and bilingual funds in its sum of expenditures—when the A & M study it points to excluded them. That study not only excluded these funds, but also those for capital outlay, transportation,

30

special education, and food service as it strove to arrive at a base expenditure level ("the cost of educating an average student") from its successful districts.

Moreover, the KLRD does not disclose, much less provide an explanation for, its chosen date of the actual expenditures it used in its calculations. But it presumably used those expenditures, *e.g.*, for at-risk students, from the most recent information available: the 2016-2017, or maybe 2015-2016, school years. For those school years, the funds available for districts to spend were calculated using the at-risk statutory weighting then in effect: .456. The process is described by K.S.A. 2014 Supp. 72-6414(a):

> "*The at-risk pupil weighting of each district* shall be determined by the state board *by multiplying the number of at-risk pupils included in enrollment of the districts by .278 for school year 2006-2007*, by .378 for school year 2007-2008 and by .456 for school year 2008-2009 and each school year thereafter. *The product is the at-risk pupil weighting of the district.*" (Emphases added.)

This resulting product is then added to their full-time equivalent enrollment. The sum is in turn multiplied by the BSAPP, or S.B. 19's BASE, to produce the state financial aid to which they are entitled. Other weightings also play a factor. See *Gannon I*, 298 Kan. at 1112 (summarizing how SDFQPA formula operates).

Several problems are immediately evident from the State's use of the weightings recommended years ago by the LPA. Before discussing them, we observe that the State has provided no rationale for currently using the values of those weightings from 2006, *e.g.*, .484 for at-risk students. See *Gannon IV*, 305 Kan. at 856 (The State will bear the burden of explaining its rationales for the choices made to achieve compliance.).

As to the first problem, by using the LPA's higher .484 at-risk pupil weighting as part of the denominator in the division to ultimately help determine the KLRD's "per weighted pupil base amount," the resulting quotient is obviously smaller than when using

the denominator (.456) that has been in effect since at least the 2008-2009 school year. K.S.A. 2014 Supp. 72-6414(a). The result, as admitted by the special assistant attorney general in response to questions during oral arguments, is a lower total weighted amount which in turn leads to a lower calculated "per weighted pupil" base amount, *i.e.*, BASE—$4,080.

Second, the KLRD calculations use the actual total expenditures of at-risk funds and general funds as two of the factors comprising the KLRD numerator in its division. And these two categories of expenditures were necessarily limited by the amount of available funds that were calculated using (1) the actual, lower at-risk pupil weighting of .456 and (2) a base aid figure for that year lower than the one recommended by the LPA when it was recommending .484 as the at-risk weighting. Compare the actual BSAPP for 2016-2017 ($3,852) with the LPA's non-inflation-adjusted BSAPP ($4,167) for 2005-2006: a reduction of $315.

Simply put, the KLRD's resultant quotient of "per weighted pupil base amount" is squeezed from both sides—by a lower numerator and a higher denominator. This lower amount is partially attributable to the State's inconsistent use of the at-risk weighting factor. Stated another way, the State simultaneously used different values for the same factor in the same formula to arrive at its result. It has not met its burden of explaining why. See *Gannon IV*, 305 Kan. at 856.

Given these flaws, we must conclude the State has not established any valid figure through its calculations—based upon the schools it calls successful—to show S.B. 19 is constitutionally adequate. In short, the State has not met its burden: to show that the public education financing system provided by the legislature in S.B. 19 for grades K-12 is reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose* and presently codified in K.S.A. 2016 Supp. 72-1127. See *Gannon IV*, 305 Kan. at 854, 856.

Related to our concern about the State's poorly demonstrated rationale for calculating BASE is our concern about its attempt to explain why after calculating BASE at $4,080, it instead appropriated only $4,006 for fiscal year 2018. It offers as justification the inability of districts to effectively and efficiently absorb an additional $74 per student in fiscal year 2018, *e.g.*, additional teachers will be difficult to hire at, or after, the start of the school year.

The plaintiffs respond there is no evidence that districts would have any difficulties at any time of the school year in hiring paraprofessionals, "which are a proven method for increasing student performance," citing *Gannon IV*, 305 Kan. at 898. They also point out that in 2009-2010 school districts eliminated more than 500 paraprofessionals because the districts were unable to properly pay for them when the cuts started. See 305 Kan. at 898. We independently note that the districts have previously received as much as $289 million in additional funding for one school year without any demonstrated problems, especially fund absorption. *Gannon I*, 298 Kan. at 1114.

It has been suggested that at best, this reduction in the value of BASE demonstrates the State's lack of faith in its own model. At worst, it demonstrates—as the plaintiffs argue—the State's intention to never follow its model's calculations if they produced results the legislature believed it could not afford, or did not want to fund. Cf. *Gannon I*, 298 Kan. at 1185 (panel made a reasonable inference that the reduction in supplemental general state aid reflected no other reason than a choice based on the amount of funds desired to be made available by the legislature).

Constitutional inadequacy is an unfortunate conclusion to have to draw, especially in light of the amount of time the State has had to work on the specific issue of adequate funding. The State has known since December 2014 that the panel had found, based upon

33

the *Rose*-based test from *Gannon I*, that the SDFQPA funding levels had been inadequate from fiscal year 2009 through fiscal year 2015. *Gannon IV*, 305 Kan. at 857-58, 880, 884-85.

Several months after the panel ruled that funding under the SDFQPA was inadequate, the 2015 legislature repealed that law and replaced it with CLASS, choosing to essentially freeze for two years the funding at the SDFQPA-computed levels of fiscal year 2015—levels which the State knew the panel recently had found inadequate. 305 Kan. at 857-58. The legislature then gave itself more than two years to study, design, and pass a worthy replacement to the SDFQPA by setting CLASS to expire on June 30, 2017. 305 Kan. at 918.

Additionally, the State has known since June 2015 that the panel also found CLASS's funding levels to be unconstitutionally inadequate for fiscal years 2016 and 2017. *Gannon IV*, 305 Kan. at 858. So at a minimum, by that date the State knew the panel had found inadequate funding from fiscal year 2009 through fiscal year 2017. And finally, it has known since March 2017 that this court affirmed the panel to hold CLASS was inadequately funded in fiscal year 2016 and fiscal year 2017. *Gannon IV*, 305 Kan. at 855-56.

*The State's "effective BASE" argument is an ineffective one.*

The State also claims the 2006 LPA study "provides further support for the legislature's conclusion that S.B. 19 is reasonably calculated to remedy the constitutional violations identified in *Gannon IV*." Specifically, while the LPA cost study was not a substantial factor in its successful schools analysis, the State contends that the latter's funding nevertheless matches up well with the former's recommended funding. See

34

*Gannon IV*, 305 Kan. at 917 (cost studies should not be ignored by the State in creating a remedy).

The plaintiffs reject how the State uses the LPA cost study to support its adequacy argument, offering their own version of its proper application to this case. As explained below, we do not fully agree with either party. But we ultimately conclude the State's embrace of the LPA study still does not demonstrate it has met its burden of showing constitutional compliance.

We begin by observing the State correctly recognizes the panel relied, at least in part, upon the LPA study recommendations to reach a number of its funding conclusions. Accordingly, for its argument the State accepts the panel's calculation in which the panel purported to take the LPA study's 2006 base amount and inflated it to $5,119 in 2011-2012 dollars. From there, the State attempts to further adjust for inflation by using an online calculator from the Bureau of Labor Statistics to reach a BASE of $5,468 as of May 2017—all based upon the LPA study's recommendations.

The State also correctly recognizes the LPA study's funding recommendations did not include consideration of LOB funds. So it argues that any funding totals for measuring S.B. 19's adequacy must not only include funds generated using the recommended, and inflation-adjusted, LPA base but also LOB-generated funds. Accordingly, the State criticizes the plaintiffs for "almost entirely" relying on the argument that S.B. 19's funding is inadequate because fiscal year 2018's BASE of $4,006 is lower than even the fiscal year 2010 BSAPP statutorily set amount of $4,492.

In effect, the State argues that after the hundreds of millions of LOB dollars expected to be generated from S.B. 19 in fiscal year 2018 are added to the funds generated by the $5,468 BASE, the sum is so large that the BASE can readily be reduced to $4,006 without decreasing the total amount of funds otherwise available. Moreover, it

35

specifically contends these combined funds—using $4,006 to compute BASE-generated funds—will still produce $118 million more than what would have been produced by using the $5,468 BASE alone. Working backwards, the State essentially argues that its S.B. 19 funds—through BASE computations and projected LOB funds only—combine to create an "*effective* BASE" of $5,639, *i.e.*, $171 greater than the LPA inflation-adjusted $5,468.

Applying the same rationale and methods for fiscal year 2019, the State concludes that S.B. 19 totals—using $4,138 BASE-generated funds and projected LOB funds— represent an "effective BASE" of $5,728. Similar to its fiscal year 2018 computations for "extra funds," it calculates that $180 million more than the LPA-based recommendations will be available.

Greatly summarized, the plaintiffs' computations instead rely upon starting at fiscal year 2010 with a statutorily set base of $4,492, which they use to compute base aid and LOB funds. Moreover, in response to the State's contention that the LPA study's recommendation, once adjusted for inflation and without considering LOB funds, required funding a base of $5,468 in fiscal year 2018, their own calculations for inflation instead demonstrate a required base of $6,435 for that year. They emphasize that this figure is also higher than the State's "effective BASE" of $5,639, *i.e.*, even when considering LOB funds in the mix.

We adopt a straight-forward approach, relying—as did the panel and both parties—upon some LPA base aid calculations and conclusions. We start with the figures calculated by the LPA for the second (and last) of the school years it considered, *i.e.*, the $4,659 base amount the panel held was required for 2006-2007. Assuming without deciding the accuracy of the Bureau of Labor Statistics inflation calculator and the dates of calculation relied upon by the State, utilizing them for inflationary adjustments increases the LPA base to $5,474 by May 2017. See, *e.g.*, *Gannon IV*, 305 Kan. at 895

36

("panel found that every witness, including experts, who testified on the subject confirmed that the costs of educating Kansas students and the demands on Kansas education had only increased since 2007"). That figure is admittedly quite close to the State's calculation, $5,468, which it based upon the panel's computations.

The main problem for the State arises, however, when it is understood that the LPA authors did not stop there. Specifically, merely adjusting the LPA study's figures for inflation ignores a critical part of its analysis and conclusion. That is, adjusting for inflation essentially only preserves the status quo on student performance. According to the LPA, if performance is also to be improved, inflation-adjusted monetary figures need to be further adjusted upward to accomplish that goal. Indeed, as we noted in *Gannon IV*, the LPA study had "concluded, with '99% confiden[ce],' that the relationship between student performance and district spending was positive, *i.e.*, that 1% increase in student performance was associated with a .83% increase in spending." 305 Kan. at 900.

These conclusions of the LPA study are clearly expressed. The LPA first set forth its estimates for the base aid for students in school years 2005-2006 ($4,167) and 2006-2007 ($4,659). LPA study, p. 35. It then explained why in only one year this amount increased nearly $500, *i.e.*, almost 12%:

> "Our estimate for 2006-07 increases in part because of inflation, *but also because the standards are higher in 2006-07.* For example, between 2005-06 and 2006-07, the standard for 10th grade math increases from 47% proficiency to 56%, and the standard for 5th grade reading increases from 63% proficiency to 70%.
>
> "*The estimated base-level cost of meeting standards will continue to increase significantly in future years*, because the standards adopted by the [State] Board increase each year until 2013-14 (when 100% of all students are required to reach proficiency on Statewide assessment tests.)" (Emphases added.) LPA study, p. 35.

37

We recognize that the 100% proficiency standard cited by the LPA has been lowered since then. We also recognize that changes can be made to "the labels for the student performance standards, the level of skills needed to meet those standards, and even the tests for measuring performance against those standards." 305 Kan. at 905. But most important, "through it all, the underlying purpose of the standards remains constant; here, to determine educational proficiency in any given year." 305 Kan. at 905. And we clearly held in *Gannon IV* that the Kansas public education financing system was unconstitutional—when only 75% of all public school K-12 students were at grade level or above in the basic skills of both math and reading, and a significant group of harder-to-educate students were being left even further behind because of inadequate funding. 305 Kan. at 906-08, 913. We expressly noted that student proficiency levels were not only low but also appeared to have steadily regressed after the 2011-2012 school year through 2015-2016. *Gannon IV*, 305 Kan. at 904. The following chart demonstrates the levels.

| Year | BSAPP | All below grade level ELA | All below grade level Math | All High School below grade level ELA | All High School below grade level Math | All 8th Grade below grade level ELA | All 8th Grade below grade level Math |
|---|---|---|---|---|---|---|---|
| 2011-12 (FY 2012) | $3,780 | 12.4% (panel held scores began to falter/ waiver) | 14.1% | 10.6% | 15.4% | 11.8% | 15.2% |
| 2012-13 (FY 2013) | $3,838 | 14.3% | 20.5% | 11.5% | 19.2% | 13.3% | 22.2% |
| 2013-14 (FY 2014) | $3,838 | 0 data (server down) | 0 data (server down) | 0 data (server down) | 0 data (server down) | 0 data (server down) | 0 data (server down) |
| 2014-15 (FY 2015) | $3,852 | 20.7% | 23.3% | 23.7% | 36.9% | 20.5% | 36.8% |
| 2015-16 (FY 2016) | $3,852 (CLASS) | 23.3% | 26.3% | 27.8% | 40.8% | 23.4% | 40.1% |

Accordingly, we concluded more funding was needed to raise performance to at least reach the minimum standards of K.S.A. 2016 Supp. 72-1127. 305 Kan. at 913-14. In S.B. 19, the legislature has declared its "purpose and intention" to provide a financing system to meet those statutory standards. S.B. 19, § 70.

But as the State currently professes to provide adequacy, it does not indicate why, how, or by how much, any of these levels are going to be improved by its proposed level of funding in S.B. 19—whether for "all students" or all subgroups (except perhaps for at-risk). Cf. 305 Kan. at 855, 906-07 (approximately 15,000 African-American students and approximately 33,000 Hispanic students not proficient in reading and math). And given the above table showing results of "all" students tested, we must also expressly reject the State's occasional contention throughout its brief that in *Gannon IV* we were concerned exclusively with the underperforming subgroups and that only their performance caused by inadequate funding was the basis for the Article 6 violation.

We contrast the State's present failure with the example of its 2006 LPA study which concluded it would cost $500 more per year in base aid per pupil to meet inflation and improve student performance to specified levels. LPA study, p. 35. This improvement included, but was not limited to, raising 10th grade math proficiency to reach the new standard that increased by 9% and raising 5th grade reading proficiency to reach the new standard that increased by 7%. LPA study, p. 35. And it is the plaintiffs who argue—without dispute by the State—that during fiscal year 2018 and fiscal year 2019, inflation will consume approximately $158 million of S.B. 19's $292.5 million "increase," leaving an average of approximately $67 million each year for actually improving proficiency. The State makes no effort to show how even this amount of new money could improve performance. See, *e.g.*, *Gannon IV*, 305 Kan. at 892, 900 (substantial competent evidence supported panel's finding that money makes a difference in public education).

Ultimately, we must also reject the State's overall argument that (1) simply adding LOB funds to the LPA study's inflation-adjusted "base" (2) can create an "effective base." Inherent in this argument is the contention that the two bases are somehow comparable. But this is a false equivalency because they are fundamentally different with frequently different purposes.

The category of at-risk students readily illustrates some of those differences. For fiscal year 2018, school districts will receive $4,006 BASE for every student in their district. See L. 2017, ch. 95, § 4(jj). For each at-risk student, the districts will receive an additional $1,939—$4,006 BASE multiplied by the at-risk statutory factor of .484. L. 2017, ch. 95, § 23(a). But the at-risk factor does not apply to LOB funds because they are not included in S.B. 19's calculation of total foundation aid. So it cannot produce a multiplier effect to increase these funds—by nearly 50 cents on the dollar—for the hundreds of districts with these students. The difference becomes even more important when considering the legislature's growing emphasis to shift away from funding education through base aid toward a greater reliance on LOB funds. See *Gannon III*, 304 Kan. at 501 (acknowledging shift, with BSAPP decreasing as LOB cap steadily increased).

For example, the extra funds provided for at-risk students that are lost because of a $10 reduction in the underlying BASE cannot be replaced by LOB funds that merely restore the $10 to the level of BASE. This result runs counter to the acknowledgment that at-risk students "require more resources for their education than others" and to the legislature's accompanying rationale for S.B. 19's increase of the at-risk ratio from .456 to .484. *Gannon IV*, 305 Kan. at 877; see also *U.S.D. No. 229*, 256 Kan. at 244.

In a more general contrast to the BASE, LOB-generated funds do not provide the same fixed amount to every student regardless of their locale. The individual districts that levy those discretionary mills not only retain these funds, but the amounts of those funds can also vary widely among the districts because of differences in property wealth, as well as differences in the LOB percentage of their general state aid authorized by their individual school boards. See *Gannon I*, 298 Kan. at 1182-83; L. 2017, ch. 95, § 15(h) (LOB-generated funds remain in the local district). Not even the supplemental general state aid ensures that every student receives the same amount of LOB funding. See 298

40

Kan. at 1187; L. 2017, ch. 95, §§ 4(jj), 15, 17. So for the State to essentially argue that every student in every district is the beneficiary of the same "effective base," *i.e.*, BASE plus LOB-generated funds, is simply incorrect.

We observe that in fiscal year 2016, LOBs generated more than $1 billion, which KSDE projects to rise to approximately $1.1 billion in fiscal year 2018. See *Gannon IV,* 305 Kan. at 893. Instead of being included in the total foundation aid formula, and being subject to any of those limitations, the LOB funds can be used by the districts in a myriad of other ways, *e.g.*, to directly supplement funding from the base formula. See *Gannon IV*, 305 Kan. at 893 (LOB funds, generally unrestricted in their use by local districts, now pay for nearly one-fourth of districts' operating expenses.). In short, the more that LOB funds are used to pay the expenses of the basic education owed to students, then the less that state funds will be necessary to do so. See *Gannon III*, 304 Kan. at 501 (BSAPP decreased as LOB cap increased). It logically follows that even less funding then will go to benefit the weighted pupils—whether bilingual education, vocational, at-risk, or otherwise—through the total foundation aid formula. And those funds will continue to be reduced as long as school boards, and their voters, are able to increase their LOB authorizations and mill levies and use surrogate funds—with the legislature's empowerment and encouragement.

Continuing that trend to its ultimate conclusion would mean that all the expenses of the basic education, *i.e.*, BASE, would instead be paid for with LOB funds. That would result in statutory weights—assuming they continued to exist—having no effect and large losses being suffered by the numerous districts whose enrollments would not be adjusted. So the greater the reliance on LOB-generated funds, and the less the reliance on BASE-generated funds, the more the specter of unconstitutional structure looms.

Finally, accepting the State's argument about "effective BASE" would be akin to believing that if 20 districts each received $10 million in extra funding, the resulting $200

41

million had been added to the total funding of all districts, then divided by the total number of students to produce an effective rate for the State. Because only the students in the 20 districts would receive the benefit, however, the "effective rate for all" argument cannot be accepted. Cf. *Gannon I*, 298 Kan. at 1173 ("'[E]ven if the *total appropriation* for schools is *ample*, a system of finance that allocated the entire amount to half of the school districts in the state, while leaving the other half with none, cannot be considered a suitable provision for finance.'" [Emphasis added.]) (quoting Levy, *Gunfight at the K-12 Corral*: *Legislative v. Judicial Power in the Kansas School Finance Litigation*, 54 Kan. L. Rev. 1021, 1069 [2006]).

Although related, this particular problem should not be confused with another one that is also potentially created by the legislature's increased reliance on LOB funding. Specifically, some school boards or their voters may reject raising their LOB percentages to obtain funding—whether through higher mill levies alone or together with supplemental state aid—to replace those monies that have been lost by a lowered BASE. See *Montoy IV*, 282 Kan. at 30-31 (Rosen, J., concurring) ("[B]ecause the LOB is optional and some school boards or taxpayers may reject a local tax to support their school district, children in districts in which base level funding is inadequate and in which an LOB is not adopted, or is not adopted at the full cap, may not have the funds necessary for a constitutionally adequate education.").

Retaining or even increasing the reliance on LOB funding as a means of providing a constitutionally adequate education may, of course, be a policy question for the legislature. But at some point the constitutionality of the various configurations ultimately created by the legislature that express or promote that policy is a question solely for this court.

> "[O]ur Kansas Constitution clearly leaves to the legislature the myriad of choices available to perform its constitutional duty; but when the question becomes whether the legislature has

42

actually performed its duty, that most basic question is left to the courts to answer under our system of checks and balances." *Gannon I*, 298 Kan. at 1151.

See also 298 Kan. at 1167 ("'"[A]n act of the Legislature repugnant to the constitution is void."'") (quoting *Marbury v. Madison,* 5 U.S. [1 Cranch] 137,177, 2 L. Ed. 60 [1803]).

*S.B. 19 as outlier*

Finally, we further note other calculations in the record of "new money needed" for fiscal year 2018 and fiscal year 2019 are considerably higher than the $292.5 million presented by the State. At the high end is $1.7 billion as calculated by the plaintiffs by averaging the legislatively ordered cost studies performed by A & M in 2002 and the LPA in 2005-2006 and then adjusting for inflation. And next highest is approximately $893 million as presented to the governor by the Kansas State Board of Education (SBE) in its budget for fiscal year 2018 (base of $4,604 for around $565 million) and fiscal year 2019 (base of $5,090 for approximately $328 million). The next highest is $819 million as calculated by plaintiffs using the panel's fiscal year 2014 proposed base of $4,980 in fiscal year 2018 and continuing to adjust for inflation by increasing that base to $5,055 in fiscal year 2019. The fact these wide-ranging calculations have been presented does not alone resolve the issue of adequate funding. The magnitude of the difference between those calculations and S.B. 19's, however, emphasizes the need for the State to truly demonstrate the validity of its funding approach and the financial figures that approach produces.

*At-risk funding*

Although not clearly articulated, the State occasionally appears to also argue that it cured all the constitutional inadequacies this court found in *Gannon IV* solely by providing additional funds for at-risk students. As support, the State cites: (1) the

increase to the at-risk weighting; (2) the 10% at-risk floor; (3) funding full-day kindergarten; (4) $2 million for preschool-aged at-risk students; (5) the requirement that at-risk funds be spent on best practices; and (6) the requirement that any year-end balance in the at-risk fund remain there and not be used for other purposes.

Districts receive at-risk funds based on whether a student is eligible for free meals under the National School Lunch Act, *i.e.*, the "free meal proxy." See L. 2017, ch. 95, §§ 4(c)(1), 23(a)(2) (at-risk students are considered the same as those eligible for free meals under the National School Lunch Act).

*Increased at-risk weighting*

S.B. 19 admittedly channels more funds directly to at-risk students by raising the at-risk weighting from .456 to .484. Compare K.S.A. 2014 Supp. 72-6414(a) with L. 2017, ch. 95, § 23(a). Per the State's brief, when multiplying this higher weighting by the BASE of $4,006 the weighting change helps produce an additional $23 million. Plaintiffs argue this fix does not sufficiently address the at-risk inadequacies we found in *Gannon IV*. We conclude the State has failed to meet its burden to show the additional funds are "reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose* [*v. Council for Better Educ., Inc.*, 790 S.W.2d 186 (Ky. 1989)] and presently codified in K.S.A. 201[6] Supp. 72-1127." 298 Kan. at 1170.

In *Gannon IV*, we examined student performance results, which are maintained by KSDE, according to a number of different measures. See 305 Kan. at 901-15. Among other things, we reviewed the performance by the category of students who received free or reduced lunches. According to the KSDE, there are nearly 200,000 "free lunch" students who are therefore by definition "at risk." See 305 Kan. at 906-13. The State, however, again makes no effort to meet its burden and indicate how $23 million, coupled with S.B. 19's other provisions, will be adequate for the underperforming students of this

44

subgroup to meet the *Rose* standards. See 305 Kan. at 856 (reciting State's burden). For example, in 2016, according to figures found on the KSDE website that we judicially notice, of all the free lunch students tested, 39.8% performed below grade level in math. For ELA that year, the numbers are nearly as pronounced: 37.2% of all the free lunch students tested were below grade level in their performance.

A focus on solely high school students receiving free lunches who were tested that same year reveals even higher percentages of those performing below grade level: 59.6% were below grade level in their math performance and 45.3% were below grade level in ELA. Such telling results for students of this age are of additional concern because they have fewer years to reach their appropriate grade level in subjects we hold to be at the heart of an adequate education. See, *e.g.*, *Gannon IV*, 305 Kan. at 855.

Additionally, as mentioned earlier, this $23 million does not address the thousands of underperforming students who are not receiving free lunches about whom we expressed concern in *Gannon IV*. See 305 Kan. at 913-14.

*The 10% floor for at-risk funding*

S.B. 19 increases the number of students who qualify for the at-risk weighting because it gives even those districts with less than 10% at-risk enrollment the benefit of weighting by simply classifying 10% of the student body as at-risk. L. 2017, ch. 95, § 23(a)(3).

This issue is discussed at length in our later equity analysis. Because the plaintiffs submitted data from KLRD suggesting this provision will add $2 million, we acknowledge it increases at-risk funding. But, as analyzed later, it only benefits two school districts. Even assuming it were equitable—and we later conclude it is not—the

45

State has not offered any support for its argument that this sum significantly contributes to the adequacy issue. See 305 Kan. at 856 (State's burden).

*Funding full-day kindergarten*

S.B. 19 fully funds kindergarten by counting such students as full-time in the districts' enrollment counts. L. 2017, ch. 95, § 4(ii). Under prior law, kindergarteners counted as only .5 students regardless of whether they attended school for a full or half day. K.S.A. 2014 Supp. 72-6407(a), (e).

Full-day kindergarten is a widely accepted approach to improve student achievement. Indeed, the Kansas 2010 Commission—created to extensively monitor and oversee the school finance system—recommended that the legislature fund full-day kindergarten because of the importance of early childhood education. See *Montoy IV*, 282 Kan. at 23-24. And the panel itself held that full-day kindergarten is one of the strategies to improve student achievement identified by Kansas administrators, principals, and teachers. Moreover, the return of this strategy responds to a concern previously raised by this court that funding cuts had required the reduction or elimination of full-day kindergarten. *Gannon I*, 298 Kan. at 1130.

Plaintiffs argue, however, that providing full-day kindergarten will not favorably impact the achievement gap because in the 2015-2016 school year—the most recent year in which KSDE has data available—over 91% of eligible students were already attending full-day kindergarten. KSDE, Kindergarten Report Summary.

There admittedly are side benefits, however, to the State's fully funding kindergarten, *i.e.*, it frees up funds some school districts were already spending on it and allows them to be applied elsewhere. We note that under prior law, school districts could use their at-risk money for full-day kindergarten regardless of whether the student was

46

classified as at-risk. K.S.A. 2014 Supp. 72-6414. But we also observe that some districts were charging parents for the portion of all-day kindergarten costs not covered under the prior law. With the need for those charges now being eliminated by S.B. 19, it is clear the change will not result in "new money" for all districts. See K.S.A. 2016 Supp. 72-8255 (allowing a fee to enroll in full-day kindergarten); see also Mike Slagle, House K-12 Education Budget Committee testimony, March 27, 2017.

While fully funding kindergarten is a well-supported approach to closing the achievement gap, the State has not demonstrated how much money S.B. 19's change will actually add to the school finance system given the variety of ways districts have previously paid for it. As a result, despite probably being a move in the right direction, the State has not shown on this record why this unknown amount is "reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose* [*v. Council for Better Educ., Inc.*, 790 S.W.2d 186 (Ky. 1989)] and presently codified in K.S.A. 201[6] Supp. 72-1127." 298 Kan. at 1170; see *Gannon IV*, 305 Kan. at 856 (State's burden).

*Preschool-aged at-risk funding*

S.B. 19 provides an additional $2 million for preschool-aged at-risk students each year in 2017-2018 through 2021-2022. See L. 2017, ch. 95, § 4(ii)(2)(B). Plaintiffs concede this additional money will help reduce the achievement gap for students young enough to benefit from it. But they argue current K-12 students will not benefit. They also argue it is inadequate to remedy the overall violation found by this court in *Gannon IV*.

We agree the State has not offered any support for the argument that this figure significantly contributes to the adequacy issue. See 305 Kan. at 856 (State's burden). But as the plaintiffs admit, "an increase in targeted, at-risk funding is helpful."

*Best practices requirement for at-risk funds*

Just like the former SDFQPA, under S.B. 19 districts must have an approved at-risk student assistance program to qualify for funding via the at-risk weighting. See L. 2017, ch. 95, § 4(c)(1) (defining an at-risk student as a student enrolled in a district with an approved program); K.S.A. 2014 Supp. 72-6407(c) (same under the SDFQPA). We note KSDE's at-risk pupil assistance program guidelines provided some examples of appropriate services, including an extended year, before school programs, summer school, and extra support within a class. KSDE, Kansas At-Risk Pupil Assistance Program.

S.B. 19 also requires that all expenditures from a school district's at-risk education fund be used on best practices identified by SBE. L. 2017, ch. 95, § 25. SBE must identify and approve evidence-based best practices for at-risk program services by July 1, 2018, and school districts must utilize those particular practices beginning in the 2018-2019 school year. L. 2017, ch. 95, § 25.

The State argues this best practices requirement strengthens the prior law. Plaintiffs respond that it is premature to judge whether this requirement will increase achievement because SBE has yet to develop its list. They further point out that the eventual list may not materially differ from KSDE's traditional requirements for an approved at-risk student assistance program. And the State does not explain how it will.

We acknowledge the best practices requirement is a direct attempt by the State to help at-risk students. But the State has not demonstrated how this is going to result in a material improvement over the longstanding requirement that school districts have an approved at-risk student assistance program. See *Gannon IV*, 305 Kan. at 856.

48

*Year-end at-risk fund balance*

Under S.B. 19, any balance in the at-risk fund at the end of the fiscal year must remain there for the following year. L. 2017, ch. 95, § 25(b). This effectively readopts the pre-2012 law. See K.S.A. 2011 Supp. 72-6414a(b) (any balance shall be carried forward in the at-risk education fund). During the intervening years, districts were permitted to use any unencumbered balance remaining in that fund at the end of the fiscal year for general operating expenses. See, *e.g.*, K.S.A. 2012 Supp. 72-6414a(b) (any unencumbered balance may be expended for general operating expenses); K.S.A. 2014 Supp. 72-6460(a) (same).

Reverting to the pre-2012 requirement—that any remaining at-risk funds remain in the at-risk fund—reflects an effort to maintain funding allocated specifically to benefit at-risk students. But the State has provided no evidence to support its argument that this is a "notable departure" from prior law, *i.e.*, that "many districts used those funds for purposes not directly related to the particular needs of at-risk students." So it is unknown what actual impact this provision will have because the State has not demonstrated how many districts had balances in their at-risk funds at the end of each fiscal year and chose to transfer that money to pay general operating expenses, much less what those amounts were. See *Gannon IV*, 305 Kan. at 856.

In sum, S.B. 19 admittedly increases at-risk funding and adopts several policies. But the State has not met its burden to show the efficacy of these changes to meet the standard of constitutional adequacy. See 305 Kan. at 856. Specifically, it has not demonstrated how much new money will be available because it is now fully funding kindergarten. Nor has it demonstrated how many at-risk dollars will get carried forward into the next full year given the new limitations. The only information available to us shows there will be a total of 27 million additional at-risk dollars. This is the sum of the

49

increased at-risk weighting ($23 million), the 10% floor ($2 million), and the preschool-aged at-risk funding ($2 million).

*Conclusion regarding adequacy*

The State has not met its burden to satisfactorily demonstrate to this court that the K-12 public education financing system the legislature enacted, *i.e.*, S.B. 19, is "reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose* [*v. Council for Better Educ., Inc.*, 790 S.W.2d 186 (Ky. 1989)] and presently codified in K.S.A. 201[6] Supp. 72-1127." *Gannon I*, 298 Kan. at 1170.

EQUITY (ON THE MERITS)

*Introduction*

The State, in addition to arguing it has met its burden of establishing that S.B. 19 brings the State's education financing system into compliance with the constitutional standard for adequacy, argues S.B. 19 does not violate Article 6 through unconstitutional inequities. The State's initial brief presents three alternative arguments regarding equity. First, the State contends the plaintiffs should not be allowed to raise new equity challenges before this court. Second, it contends the plaintiffs, if allowed to raise equity challenges, have the burden to establish unconstitutionality and must overcome a presumption that S.B. 19 is constitutional. Finally, if the plaintiffs' equity challenges are considered, the State argues S.B. 19 satisfies Article 6 regardless of which party bears the burden of persuasion.

We have already rejected the State's first two arguments. In this remedial stage of the *Gannon* litigation, the State bears the burden of establishing S.B. 19 satisfies both the adequacy and equity requirements of Article 6. See *Gannon IV*, 305 Kan. at 917 ("While

50

considering cures, the legislature should also be mindful of the connection between equity and adequacy."). So the State bears the burden to establish S.B. 19's constitutionality in all respects, and no presumption of constitutionality attaches to this remedial legislation. See 305 Kan. at 856.

Consequently, we now focus on the State's third alternative argument and consider whether the State has met its burden to establish that S.B. 19 meets the equity requirement of Article 6. The plaintiffs urge us to rule that the State has not done so because S.B. 19 creates, or exacerbates existing inequities by:

- Expanding the purposes for which capital outlay funds may be used;
- Reinstating a protest petition and election process relating to efforts to increase a school district's LOB authority;
- Basing the LOB equalization formula on each preceding year's LOB rather than the current year's; and
- Allowing some districts to receive at-risk funding for 10% of their enrollment even if that number exceeds the number of students actually meeting the criteria for such funding that applies to all other districts.

We find merit in each of the plaintiffs' contentions after applying the equity test relevant to an Article 6 analysis.

*The equity test*

As our test for measuring equity under Article 6, "School districts must have reasonably equal access to substantially similar educational opportunity through similar tax effort." *Gannon I*, 298 Kan. at 1175. This test does not require that wealth-based disparities between districts be measured under a zero-tolerance test or other mathematically precise standard because "equity [is] not necessarily the equivalent of

equality." *Gannon II*, 303 Kan. at 710; see *Gannon I*, 298 Kan. at 1180, 1188. Instead, "[t]o violate Article 6, the disparities . . . must be unreasonable when measured by our test." 298 Kan. at 1180.

In reviewing the remedial stages of school-finance litigation, we have consistently concluded that wealth-based disparities are unreasonable if the remedial legislation increases or exacerbates inequities among districts. See, *e.g.*, *Gannon III*, 304 Kan. at 504 (holding legislature's "use of the former capital outlay aid formula for the LOB funding system increases and exacerbates the disparity among districts"); *Gannon II*, 303 Kan. at 733 ("The legislature's failure to provide additional supplemental general state aid for any LOBs increased before July 1, 2015, exacerbates wealth-based disparities between districts in the future and does not comply with our order in *Gannon I*."); *Gannon I*, 298 Kan. at 1173-74 ("legislat[ure's] increase in the LOB cap exacerbates the wealth-based disparities between districts"); *Montoy III*, 279 Kan. at 833-34 (concluding increase in LOB cap without additional supplemental general state aid exacerbates wealth-based disparities among districts and thus falls short of the equity standard set in Article 6).

As with adequacy, the legislature must comply with the equity requirement of Article 6 "through structure and implementation." See *Gannon I*, 298 Kan. at 1198.

ISSUE 2: *The State has not met its burden of establishing that school districts have reasonably equal access to substantially similar educational opportunity through similar tax effort after S.B. 19 expanded the authorized uses of the capital outlay fund.*

The plaintiffs argue S.B. 19 violates Article 6 because it expands the purposes for which capital outlay monies may be used. Before analyzing this issue, some additional background on capital outlay is helpful.

S.B. 19 authorizes school districts to raise and use capital outlay revenues under a system essentially identical to ones in place throughout much of the time the SDFQPA was in effect. The capital outlay statutes, which were not technically part of the SDFQPA and are not part of the KSEEA, allow a local board to create a capital outlay fund with a levy against taxable tangible property in its district. See L. 2017, ch. 95, § 50 (authorizing fund); L. 2017, ch. 95, § 48 (defining the Kansas School Equity and Enhancement Act as § 3 through § 48 of S.B. 19).

Local boards have had, and under S.B. 19 continue to have, discretion regarding the level of taxation necessary to support their fund, although for most of the time since the 1992 adoption of the SDFQPA the legislature has capped the taxing limit. Since 2005, the legislature has imposed an 8-mill cap. K.S.A. 2014 Supp. 72-8801; see *Montoy III*, 279 Kan. at 822 (discussing specifics of this history). S.B. 19 also imposes an 8-mill cap. L. 2017, ch. 95, § 50(c)(6).

To implement this mill levy, school boards must pass an annual resolution and publish it once a week for two consecutive weeks. The resolution then becomes effective unless 10% of the district's qualified electors sign a protest petition within 40 calendar days of the last publication. If a protest-petition effort is successful, the school board may either abandon the resolution or notify the county election officer of an election at which a majority of the voters must approve the resolution for it to become effective. L. 2017, ch. 95, § 89(a). This process differs very little from that contained in previous statutes. One significant difference, however, limits the effectiveness of a board's resolution to one school year as compared to five years under previous statutes. Compare L. 2017, ch. 95, § 89(a) with K.S.A. 2014 Supp. 72-8801(a).

As with LOBs, the amount of revenue raised through a mill levy varies from district to district because of differences in the assessed property value of each one. See *Gannon I*, 298 Kan. at 1178-79 (providing an example based on similar sized districts

from "opposite ends of the spectrum" of assessed property value; in one district, a mill generated approximately $18,000 to $19,000 and, in the other, approximately $350,000 to $400,000). In the instant case, the plaintiffs point to the low assessed value of property in their districts and compare that to neighboring or comparably sized districts. For example, citing to KSDE reports, the plaintiffs note that during the 2016-2017 school year, plaintiff U.S.D. 500 (Kansas City) raised only around $5.6 million with its 8-mill levy. In contrast, nearby U.S.D. 229 (Blue Valley), which is in a different part of the Kansas City metropolitan area, raised more than $22.7 million with its 8-mill levy.

To reduce the funding inequity inherent in property taxes, the legislature has provided for capital outlay state aid, commonly known as equalization aid, through which levying districts with lower property wealth qualify for extra money from the "school district capital outlay state aid fund." See L. 2017, ch. 95, § 50(b); *Gannon I*, 298 Kan. at 1178. The formula for computing capital outlay equalization aid under S.B. 19 remains essentially the same as the formula used during the time the SDFQPA was in effect. Compare L. 2017, ch. 95, § 50(c) with K.S.A. 2014 Supp. 72-8814(b).

Under the formula, a district's equalization factor is calculated by first determining the median of the Assessed Valuation Per Student (AVPS)—or, as it was labeled under the SDFQPA, the Assessed Valuation Per Pupil (AVPP)—of all school districts and then rounded to the nearest $1,000. For every $1,000 a district's AVPS is above the median AVPS, the standard "state aid percentage factor" of 25% is decreased by 1%. For every $1,000 a district's AVPS is below the median AVPS, the 25% state aid factor is increased by 1%. So a hypothetical district in which the AVPS is $10,000 below the median AVPS would have a state aid percentage factor of 35%, which would entitle it to state aid payments in an amount equal to its capital outlay levy revenues multiplied by 35%. A district's state aid percentage factor may not exceed 100%. L. 2017, ch. 95, § 50(c).

Applying this formula in the 2016-2017 school year, U.S.D. 229 (Blue Valley) did not qualify for such state aid; consequently, the $22.7 million it raised through its 8-mill levy did not increase. On the other hand, plaintiff U.S.D. 500 (Kansas City) qualified for this aid with a percentage factor of 65% (one of the state's highest rates). This means the $5.6 million it raised entirely through its 8-mill levy was increased by approximately $3.6 million in state aid. So cumulatively, U.S.D. 500 had $9.2 million in capital outlay revenue for its 20,520 students, or about 41% of what U.S.D. 229 raised for its 21,620 students solely through the same tax effort—the legislatively capped 8-mills. Phrased another way, U.S.D. 500 had $448.34 per student to spend on capital outlay, while U.S.D. 229 had $1,049.95 per student for the same purpose.

Historically, the capital outlay fund has been used for the acquisition and maintenance of tangible property, although it was expanded to pay for the housing of certain students enrolled in area vocational schools. More specifically, in the last years of the SDFQPA and in the two years that CLASS was in effect, this fund could be used to acquire, construct, reconstruct, repair, remodel, furnish, maintain, or equip school district property and equipment necessary for school district purposes, including:

> "(1) Acquisition of computer software; (2) acquisition of performance uniforms; (3) housing and boarding pupils enrolled in an area vocational school operated under the board of education; (4) architectural expenses; (5) acquisition of building sites; (6) undertaking and maintenance of asbestos control projects; (7) acquisition of school buses; and (8) acquisition of other fixed assets . . . ." K.S.A. 2016 Supp. 72-8804(a) (during CLASS); K.S.A. 2014 Supp. 72-8804(a) (during SDFQPA).

Other provisions authorized districts to use the fund to pay principal and interest on bonds and to finance certain redevelopment projects. See K.S.A. 2016 Supp. 72-8801(a) (during CLASS); K.S.A. 2014 Supp. 72-8801 (during SDFQPA).

S.B. 19, however, now expands the list of authorized expenditures from these funds to include property and casualty insurance and utility expenses. S.B. 19, § 91(a). This expansion does not alter the amount of revenue that can be raised—the 8-mill cap applies regardless of the reason funds are spent. Nor does S.B. 19 recognize a new type of expense not previously incurred by school districts, as the costs of property and casualty insurance and utilities have long been among the expenses incurred by all school districts. And these two categories traditionally represent substantial expenses every year.

Before the adoption of S.B. 19, a district would have paid these particular expenses from its general fund, its LOB fund, or both. Now, because S.B. 19 allows the capital outlay fund to become a part of this mix, there is a potential shift from the fund or funds historically used to pay them.

With this stage set, we begin with the parties' disagreement about the constitutionality of this expanded use authority. The State argues this expansion does not raise an equity concern because utilities and property and casualty insurance "logically and obviously relate to the purposes of capital outlay." Further, the State argues, the new provision applies "in the same way to every district," in no way affects the districts' relative tax effort, and the State continues to fund the same capital outlay equalization formula that this court approved in *Gannon III*, 304 Kan. 490. The plaintiffs disagree, arguing this expansion violates equity in two ways.

First, according to the plaintiffs, the expansion undercuts the *Gannon III* court's rationale for allowing less equalization aid for capital outlay than for LOB—*i.e.*, because of the former's limited uses. See *Gannon III*, 304 Kan. at 505-07. In constructing this argument, the plaintiffs contend S.B. 19 "changes the authorized uses of the capital outlay fund in a manner that directly ties the fund to the district's ability to perform its basic function." This change, the plaintiffs argue, is significant because the legislature's equalization point for the capital outlay fund is significantly lower than for the LOB fund.

56

This means that for every dollar generated by a discretionary local mill levy, a district receives less equalization aid from the State for its capital outlay fund than it does for its LOB fund. We agree with plaintiffs.

*Gannon III* is of guidance here. It involved a legislative change passed in response to this court's decision in *Gannon II*, which held that the LOB and capital outlay provisions in CLASS failed to meet the equity requirement of Article 6. *Gannon II*, 303 Kan. at 713-28. A comparison of the LOB and the capital outlay funds and the pre-CLASS and CLASS formulas for each fund helps explain the *Gannon III* discussion and its relevance to the specific equity issue we consider today.

For both the LOB and capital outlay funds, differences in the AVPP (as it was then referred to) from district to district create disparities in the amounts districts can raise from the same tax effort—*i.e.*, the same mill levy. *Gannon I,* 298 Kan. at 1113. Despite this similarity between the two funds, the law after *Montoy IV* provided a separate equalization formula for each. 282 Kan. 9. We have acknowledged that historically, the capital outlay equalization point has been significantly lower than the equalization point used in the LOB formula. See *Gannon III*, 304 Kan. at 505. While the capital outlay formula used the median AVPP of all school districts as its equalization point, the LOB statutes instead moved the point higher and provided "supplemental general state aid" to those districts with an AVPP below the 81.2 percentile of statewide AVPP. See, *e.g.*, K.S.A. 2013 Supp. 72-8814 (capital outlay); K.S.A. 2013 Supp. 72-6434(a) (LOB); *Gannon I*, 298 Kan. at 1183.

But after our decision in *Gannon II*, the 2016 legislature passed a bill attempting to apply the SDFQPA-era capital outlay state aid formula to determine the amount of LOB supplemental general state aid. L. 2016, ch. 45, § 3. Because of capital outlay's lower equalization point, this switch had "the effect of substantially decreasing the number of aid-qualifying districts and reducing the amount of equalization aid to those

that remain[ed] eligible." *Gannon III*, 304 Kan. at 505. Despite these admitted reductions, the State argued we should accept the newly adopted formula for LOBs because we had previously approved its use for capital outlay equalization.

We rejected this argument because it "fail[ed] to account for fundamental differences between the programs." *Gannon III*, 304 Kan. at 505-06. One important difference was evident when comparing the capital outlay fund's statutorily limited purposes with the flexibility of LOBs, which could be used to "enhance[] a district's ability to perform its basic function." 304 Kan. at 506.

We identified the relative magnitude of the revenue raised for LOBs as compared to that raised for capital outlay as a second significant difference between the two funds. We specifically observed that statewide the LOB tax rate is "'much larger and the dollars involved are much greater . . . .'" 304 Kan. at 506 (quoting testimony of KSDE Deputy Commissioner Dale Dennis).

As a third important difference, we observed that the overall reliance on LOB funding was much greater. Where some districts did not even levy taxes for capital outlay, "districts now are required to rely more heavily on their LOB funds to perform their basic functions." *Gannon III*, 304 Kan. at 507. In sum, "[w]hile these disparities are acceptable when computing aid in the smaller and less flexible capital outlay arena, the degree of inequity among the districts is too great when considering that the LOB has developed into such a major source of basic, and versatile, educational funding." 304 Kan. at 507. S.B. 19's expansion of authorized uses for the capital outlay fund implicates several of these important factors we emphasized in *Gannon III*.

We note the size of the capital outlay fund potentially increases by a substantial amount under S.B. 19. As capital outlay expenditures were defined by prior law, in the 2016-2017 school year they totaled approximately $295.5 million for all school districts.

58

According to a report submitted by the KSDE during legislative hearings, districts also spent another $123 million on utilities and $39 million on property and casualty insurance in fiscal year 2016, for a total of approximately $162 million.

We concede many districts already levy the 8-mill limit, so the capital outlay fund probably will not grow enough to pay that full $162 million of these newly authorized expenses. Nevertheless, some districts have no capital outlay mill levy and can institute one, while many others not only have one but also have the room beneath the limit to raise their levy to facilitate paying these additional expenses with larger capital outlay funds. And other districts could replace their expiring capital outlay expenditures, *e.g.*, final payments of principal and interest on long-term bonds, with these newly allowed, and possibly greater, expense payments. Consequently, while according to figures in the record the resulting capital outlay budgets would remain substantially less than all LOB budgets, there still could potentially be a significant increase in the size of the capital outlay fund since *Gannon III*. And as further explained below, some districts will rely more heavily on this fund to perform their basic educational function.

This potential growth in the capital outlay fund becomes more significant in light of the increased flexibility provided to districts by S.B. 19. Because utilities and casualty and property insurance are now authorized to be paid for from these funds, monies historically designated to pay those expenses from a district's general fund or LOB fund are now released for other purposes. And monies from those specific funds have even more flexibility in terms of authorized uses than capital outlay. See, *e.g.*, *Gannon IV*, 305 Kan. at 893 (LOB funds are generally unrestricted in their use.). This results in increased overall flexibility of districts' spending.

While this overall increased flexibility can hold many advantages for the local school boards when making spending decisions, it also can cause concerns if it creates or increases wealth-based disparities. And, as the plaintiffs argue in their second point,

59

wealth-based disparities arise from S.B. 19 because of the varying ability of districts to take advantage of this shift of certain expenditures to capital outlay funds, and that variation is tied to wealth.

For example, U.S.D. 500 (Kansas City) qualifies for equalization aid in both LOB and capital outlay. If it pays for utility expenses from its general fund it pays with what is, in effect, a fully equalized amount. In short, the general fund composed of state foundation aid—BASE-generated funds—is essentially equalized at the 100 percentile because the state pays the full amount due a district for its weighted enrollment regardless of its AVPS. See *Gannon I,* 298 Kan. at 1112-13. But if the money for these utility expenses is paid from U.S.D. 500's LOB fund, that money will not have been fully equalized, *e.g.*, only equalized at the 81.2 percentile. See L. 2017, ch. 95, § 17(b)(3). And the scope of U.S.D. 500's ability to manage its finances is further reduced if the utility expenses are paid from its capital outlay fund, with its still lower equalization point of 65%. Given the size of utility expenses and the need to pay them, clearly such variations among the different funds constrain the flexibility of U.S.D. 500 and other property-poor districts. In the meantime, wealthier-property districts retain more flexibility—with full flexibility being enjoyed by those receiving no aid whatsoever.

In addition, as the plaintiffs argue, some school districts also have varying abilities to take any advantage of the capacity to shift funds, because of the overall disparity in revenue caused by varying property values among districts. Again using U.S.D. 500 (Kansas City) as an example, if it used its capital outlay fund to pay for utilities and property and casualty insurance (which were reported to the legislature as costing approximating $9.3 million during fiscal year 2016), it would have no capital outlay funds remaining for any other purposes, *e.g.*, acquisition of school buses and other fixed assets. See, *e.g.*, L. 2017, ch. 95, § 91. We reach this conclusion because the funds generated by the 8-mill levy in its district only total approximately $9.2 million (8-mill levy of $5.6 million plus state aid of $3.6 million in school year 2016-2017).

60

By contrast, if during that same year the nearby U.S.D. 229 (Blue Valley) used its capital outlay funding for utilities and property and casualty expenses, which the records show were also approximately $9.2 million, it would still have about $13.5 million left to use for other capital outlay expenditures. We know this because an 8-mill levy in its district alone raises approximately $22.7 million—even without qualifying for state aid.

The financial numbers of these two similarly sized neighbors, each with approximately 21,000 students, clearly underscore the disparity that results not only from the capital outlay equalization formula but also, and more importantly for this discussion, a disparity that is exacerbated by allowing a shift of more types of expenses to be paid from that fund.

As intimated earlier, we have recognized that "allowing local revenue-raising authority . . . will almost certainly create wealth-based disparities among the districts," leading to inequality. *Gannon III*, 304 Kan. at 501. This means some level of inequality has been constitutionally tolerable. See, *e.g.*, 304 Kan. at 507 (some "disparities are acceptable"). Nevertheless, given the potential inequities that arise from local funding based on property taxes, the legislature must always be cognizant that capital outlay and LOB statutory changes raise equity concerns. Indeed, in previous situations where the legislature has exacerbated wealth-based disparities while attempting to cure past inequities that violate our state constitution, we have rejected the legislative change. See, *e.g.*, *Gannon III*, 304 Kan. at 516 ("the application of the SDFQPA capital state aid outlay formula to LOB supplemental general state aid not only fails to cure, but also worsens the [LOB] inequities affirmed to exist in *Gannon II*").

The same conclusion applies here:  The amendments to K.S.A. 2016 Supp. 72-8804 accomplished by S.B. 19, § 91 exacerbate wealth-based disparities, resulting in unacceptable levels. Under these provisions, school districts will not have reasonably

61

equal access to substantially similar educational opportunity through similar tax effort. Stated more precisely, the State has failed to meet its burden of establishing that section 91 complies with the equity standard of Article 6. See *Gannon IV,* 305 Kan. at 856 (party asserting compliance with court decision ordering remedial action bears burden of establishing that compliance).

ISSUE 3: *The State has not met its burden of establishing that school districts have reasonably equal access to substantially similar educational opportunity through similar tax effort by imposing different procedures for certain districts to raise their maximum LOB.*

The plaintiffs also contend that S.B. 19 violates the equity component of Article 6 by subjecting only some of the districts to a protest and election process in order to raise their LOB limits and gain full access to all available LOB funds. Before addressing this argument, some previously stated information should be kept in mind. And additional background about the LOB process needs to be provided, *i.e.*, how school boards authorize LOB budgets based on certain percentages of their districts' state financial aid.

When a school board imposes a mill levy to fund an LOB, the revenues produced cannot exceed an amount equal to a set percentage or "cap" of a district's state financial aid—the amount produced by multiplying the BSAPP (now BASE) times a district's enrollment as adjusted by adding various weightings. *Gannon I*, 298 Kan. at 1112. With the adoption of the SDFQPA in 1992, the legislature set the LOB maximum percentage, known as the "state prescribed percentage," at 25% of state financial aid and required that maximum to be reduced in future years by the same percentage points BSAPP increased. See L. 1992, ch. 280, § 29; *U.S.D. No. 229*, 256 Kan. at 246. In 1995, the legislature repealed the provision calling for decreasing reliance on the LOB as BSAPP increased. L. 1995, ch. 160, § 6.

62

The LOB statutory cap remained at 25% until the 2005-2006 school year when it began to steadily increase as the legislature shifted its emphasis from funding BSAPP with the 20-mill levy on all districts to a greater reliance on district-elective LOBs. See *Gannon III*, 304 Kan. at 501. Although "increased dependence on local property taxes, as decided by each school district, exacerbates disparities based on district wealth," *Montoy III*, 279 Kan. at 839, the trend has accelerated: From the 2005-2006 school year until the 2013-2014 school year, the cap rose to as high as 32% but then settled for several years at 31% of a district's state financial aid. Compare K.S.A. 2013 Supp. 72-6433(a)(1) (31%) with K.S.A. 2008 Supp. 72-6433c(b)(9)(B) (30% for school year 2006-2007, 32% for 2007-2008 and each subsequent year). By the 2013-2014 school year, 14 school districts had raised their LOB authorization to 31%. Nine of these districts had an AVPP for LOB purposes above the statewide average AVPP—that is, they were among the wealthier districts according to that measurement.

For the last year under the SDFQPA, the 2014-2015 school year, the legislature maintained the state prescribed percentage at 31% of state financial aid. But another provision allowed any district with an authorized LOB in excess of 30% as of June 30, 2014, to adopt an additional school board resolution adding an amount not to exceed another 2% of its state financial aid. Accordingly, the effective aggregate LOB cap for those qualifying districts was 33%. See K.S.A. 2014 Supp. 72-6433(e). Twenty-nine school districts took advantage of this provision and raised their LOB authorization to 33% for the 2014-2015 school year.

The special provision allowing the additional resolution of up to 2% had another unique characteristic: The legislature provided that such a resolution would be "effective upon adoption and shall require no other procedure, authorization or approval." K.S.A. 2014 Supp. 72-6433(e)(2). Before this time, board resolutions authorizing permanent increases in LOB authority had been subject to either (1) a protest petition that, if

successful, required a district-wide election before the resolution could become effective or (2) an automatic mandatory election.

The LOB statutes provided only for a protest-petition process during the initial years of the SDFQPA. And the procedure followed the same basic framework as the capital outlay fund process previously described. But the LOB process differed somewhat because not as many electors needed to sign the protest petition (5% for LOB compared to 10% for capital outlay) and the timeline was shorter (the protest petition must be completed within 30 days of an LOB resolution's last publication as compared to 40 days for capital outlay resolutions).

Beginning with the 2007-2008 school year, however, this noncompulsory nature of the election process changed as the legislature first authorized districts to raise their LOB limits above 30%. As part of that change, the legislature adopted different processes depending on whether the resolution increased the LOB authority to an amount above or below 30% of state financial aid. If the LOB did not rise above 30%, the protest-petition process still applied. But if a board resolution authorized an LOB of 31%, the legislature instead mandated an election. And the resolution could not become effective until approved by a majority vote of qualified electors in the district. See, *e.g.*, K.S.A. 2013 Supp. 72-6433(c), (d), (e); K.S.A. 2012 Supp. 72-6433(c), (d), (e).

In 2014-2015 the LOB process changed dramatically. In a unique twist, the legislature repealed the mandatory election process for increases above 30% and allowed these resolutions to become effective on board action alone—but continued the protest-petition process for increases up to 30%. The new, no-election provision for high-end increases had a short life, at least in its original form. It only applied for one school year, and all resolutions authorizing a 33% budget expired on June 30, 2015. K.S.A. 2014 Supp. 72-6433(e)(2). But the enactment of CLASS by the 2015 legislature actually minimized the effect of this sunset provision.

CLASS authorized districts to adopt an LOB budget for the 2015-2016 and 2016-2017 school years that did not exceed the greater of (1) the district's 2014-2015 LOB and property levy or (2) the LOB "such school district would have adopted for school year 2015-2016" under the provisions of the SDFQPA before its repeal. K.S.A. 2016 Supp. 72-6471(a). The second option only applied if the school board's resolution was adopted prior to July 1, 2015. K.S.A. 2016 Supp. 72-6471(e). The resolution, regardless of whether above or below the 30% threshold, was effective upon adoption and required "no other procedure, authorization or approval." K.S.A. 2016 Supp. 72-6471(b). As a result, qualifying districts were given a three-year period (school years 2014-2015, 2015-2016, and 2016-2017) in which they could increase the percentage of their LOB authorization without facing the prospect of its rejection by their voters.

During this time under the applicable provisions, the number of school boards adopting a resolution authorizing an LOB budget of 33% of the district's state financial aid began with 29 in the first year (the 2014-2015 school year) and increased to 38 in the years under CLASS (the 2015-2016 and 2016-2017 school years). No boards adopted an LOB authorization of 32%, but another six boards had continuing resolutions or adopted resolutions authorizing 31%. In short, a total of 44 districts operated under CLASS with their LOB authorizations exceeding 30%, and most were allowed to reach their maximum level by board action alone. To place this development in perspective, only one district with an LOB authorization of 31% for the 2013-2014 school year chose to remain at that level through the 2016-2017 school year.

S.B. 19 allows these 44 districts to maintain their percentage of LOB authorizations because that law does not change the state prescribed percentage of "33% of the total foundation aid of the school district in the current school year," *i.e.*, the product of multiplying the BASE by the adjusted enrollment of the district. L. 2017, ch. 95, § 15(a), (k)(2). (S.B. 19 creates two alternative LOB formulas, but the parties do not

raise equity issues related to these alternatives.) Simply put, the 38 districts that reached the State's maximum 33% authority during the past three-year election hiatus cannot raise their limit.

This also means, however, that unlike others, these 38 districts had not only been allowed to eventually reach their maximum level of statutory authorization without facing a possible voter protest and election, but they also will be allowed to maintain their level without these challenges. This is because section 15(f), a grandfathering provision, allows previously adopted resolutions to operate for the period of time specified in the resolution. And once a current LOB resolution expires, a school board may adopt a new one in an amount that does not exceed (1) "[t]he amount that the board was authorized to adopt under any resolution adopted" prior to the expiration of CLASS or (2) the statewide average for the preceding year. L. 2017, ch. 95, § 15(b). Most important, "Such resolution shall be effective upon adoption and shall require no other procedure, authorization or approval." L. 2017, ch. 95, § 15(b).

By contrast, any other board wanting to increase the percentage of its LOB authority beyond the amount allowed under either of these options must adopt and publish a resolution—which will be subject to the possibility of a protest petition. If there is such a protest, the LOB resolution will become effective only if approved by a majority of the district's electors voting in the election. L. 2017, ch. 95, § 15(c).

With this important background established concerning the procedures for raising LOB authority, we return to the plaintiffs' contention that S.B. 19's reinstatement of the protest-petition process creates equity issues. They argue this reinstatement "perpetuates a system by which the school districts do not have 'reasonably equal access' to equalization money. Instead, they have wildly inconsistent access based on the results of the election."

66

The plaintiffs point to a proposed finding of fact they assert was adopted by the panel in its June 26, 2015, order that allowing "voter discretion" creates inequity. The proposed finding explained the problem arose

> "*due to the correlation between a district's wealth and their ability to pass an election*. Testimony of Dale Dennis, May 7-8, 2015; see also Exhibit 503A, 504. Between 1995 and 2012, 48% of capital outlay elections failed. Exhibit 503A, 503. Of those, all of the failed elections took place in a district with an AVPP *below* $100,000. *Id*.; Exhibit 504. *No* capital outlay election failed in any district with an AVPP over $100,000. *Id*. However, 80% of the elections that took place in districts with an AVPP under $50,000 failed. *Id*." (Emphases added.)

The cited exhibits also included similar statistics about the success rate of LOB elections.

Although the panel did not specifically discuss this proposed finding in its order, it did generally adopt this and other proposed findings "as [its] own, unless otherwise specifically noted." We find nothing in the panel's decision that disavows the finding, which is supported by substantial competent evidence. And the finding supports the panel's conclusions that wealth-based disparities exist and that "a disparity in educational opportunity should not be allowed to arise from the difference in property wealth between school districts." See *Gannon I*, 298 Kan. at 1175-76 (stating and applying the substantial competent evidence standard when reviewing panel's findings); 298 Kan. at 1180 ("'A general finding of fact by the district court raises a presumption that it found all facts necessary to sustain and support the judgment rendered.'").

The panel's finding—a correlation exists between a district's wealth and its ability to gain voter approval of a board resolution that is certain to raise mill levies—is supported by the LOB election history contained in the record on appeal. From 1995 to 2012, 59% of all LOB elections failed, and the election success declined as AVPP declined. Eighty-one percent of the LOB elections failed in districts where the AVPP for

67

LOB purposes fell below $50,000, while 60% of the elections failed where the AVPP for LOB purposes was between $50,000 and $100,000. And only 25% failed where the LOB AVPP exceeded $100,000. These results indicate that reinstating the protest-petition process will exacerbate wealth-based disparities among the districts—except, of course, for those 38 districts already at the 33% maximum LOB authority.

We cannot say with certainty how many districts would have experienced successful petition drives had they been required to face such protests during those three years. Nor can we accurately predict those numbers for the future. We have found no historic information on this precise point in the record. Nevertheless, the panel's finding of fact and corresponding evidence in the record document the number of successful petition drives that resulted in an unsuccessful election; this finding allows us to conclude that it is more probable than not that some LOB resolutions will be defeated by voters. Whatever the failure rate might be, it obviously must compare unfavorably to a 100% success rate enjoyed by those qualifying districts that raised their LOB authorizations above 30% by board action alone during the three-year period when the protest-petition process was not in place for them.

To place these disparities in perspective, the plaintiffs point out that the 44 districts with an LOB authorization above 30% gained as much as $381 per pupil—and an average among them of $203 per pupil—over the amount these same districts would have generated if their LOBs were only at the 30% level. Cumulatively, according to the plaintiffs—and unchallenged by the State—all districts with board-set LOB authority greater than 30% of their state financial aid now have $30,741,559 more available than they would have at an authorization level of 30%.

The State responds that having elections and basing funding on the will of the people in the districts cannot be unconstitutional. According to the State, as long as it equalizes wealth disparities then it has met its obligation under the equity requirement of

68

Article 6. But the State, not local districts, has the obligation under Article 6 to make suitable provision for the finance of the educational interests of the state. *Gannon I*, 298 Kan. at 1127-29.

In *Montoy III* this court considered a somewhat similar situation but in the context of the capital outlay fund. There, the legislature removed the capital outlay mill levy cap for a period of years and then reinstated it. The legislature made the restored cap prospective only, grandfathering mill levies for up to four years, regardless of whether the levy exceeded the cap. The court concluded the unequal treatment of districts "perpetuates the inequities." *Montoy III*, 279 Kan. at 838.

The same rationale applies here. The legislature, in effect, allowed certain districts to increase their LOB authorization above 30% without having to be concerned about the uncertainties of an election process and has now grandfathered those higher LOB authorizations, including any related equalization aid. The other districts wishing to do so—potentially more than 200 of them—must now clear the structural hurdle imposed by the protest-petition process reinstated by S.B. 19, § 15.

As such, we conclude S.B. 19's provision reinstituting the LOB protest-petition process for all increases violates the equity requirement of Article 6. In short, many districts are effectively denied an access reasonably equal to the one afforded these other districts—access that is needed in order to make a similar tax effort, *e.g.*, impose a comparable mill levy. So it logically follows that because of this lost access they cannot as readily avail themselves of the advantages that would flow from that tax effort, *i.e.*, a substantially similar educational opportunity. See *Gannon I*, 298 Kan. at 1175. In other words, the State has failed to meet its burden of establishing that the LOB provision complies with the equity standard of Article 6. See *Gannon IV,* 305 Kan. at 856.

ISSUE 4: *The State has not met its burden of establishing that school districts have reasonably equal access to substantially similar educational opportunity through similar tax effort after S.B. 19 changed the LOB equalization calculation.*

The plaintiffs also argue that S.B. 19 violates Article 6's equity requirement because it calculates supplemental general state aid with a formula using a school district's LOB percentage from the preceding school year rather than the current one as was done under the SDFQPA. Compare L. 2017, ch. 95, § 17(b) with, *e.g.*, K.S.A. 2014 Supp. 72-6434. See L. 2017, ch. 95, § 4(k), 4(x) (defining terms).

The plaintiffs contend this lookback creates an inequity because an aid-qualifying district that increases its LOB authority will not receive a corresponding increase in equalization aid in the current year. For example, if a district chose to raise its LOB level from 30% to 33% in school year 2017-2018, it would not receive equalization aid on the funds it generated with that 3% in the first year of the increase. This has an obvious disequalizing effect for that particular school year, as explained below.

We begin by noting the KSDE projections for LOB funding for the 2017-2018 school year provide a one-year glimpse of the potential losses for property-poor schools depending on such supplemental general state aid. The KSDE projects that school districts will increase their LOBs by a cumulative $32.1 million in additional *local* funding. Its calculations further show that the State would typically add nearly $16.3 million of *state* supplemental aid to that amount to equalize that local spending. But with the lookback provision of S.B. 19 in place, the State avoids paying that $16.3 million. While this amount may seem minor from the perspective of total state spending on K-12 education, the impact on local districts can be significant: U.S.D. 259 (Wichita) will not receive almost $2 million, U.S.D. 500 (Kansas City) will not receive nearly $1 million, four other districts will lose at least $700,000, and another four districts will lose more than $500,000.

70

The State offers justification for the change by arguing it increases predictability and, therefore, promotes sound policy. According to the State, "Using the current year LOB to determine equalization aid poses a timing problem" because school districts do not approve their annual budgets until August, several months after the legislature has adjourned. The State also highlights the uncertainties of fluctuating property valuations and some other variables that affect the amount of money needed to cover the equalization requirement; these details are not known until after the legislature makes appropriations. In addition, the State points to testimony before the legislature where school district officials asked for certainty in funding.

In essence, the State argues a rational basis exists for its lookback decision. But we have expressly rejected a traditional rational basis test for our analysis under Article 6. See *Gannon IV*, 305 Kan. at 884. Simply put, regardless of the policy justifications for embracing predictability and certainty, the legislature may not violate Article 6 under that banner by creating or exacerbating a wealth-based inequity. *Gannon III*, 304 Kan. at 513 (budget certainty is an admirable goal but it has no bearing on Article 6 equity compliance).

We have frequently commented on the various problems with using a property-based taxing system. See, *e.g.*, *Gannon III*, 304 Kan. at 501 (observing that the State's decision to rely on increased LOB funding to adequately fund K-12 education brought with it various challenges). And we appreciate that the problems became more difficult to manage as reliance on LOB funding has increased. Nevertheless, the effort to mitigate the effects of these problems cannot extinguish the constitutional obligation to provide equitable funding. As we have previously cautioned: "[I]f local funding is to continue, this disparate effect has to be limited so it complies with Article 6." 304 Kan. at 501.

71

Unfortunately, S.B. 19's LOB lookback provision does not limit this disparate effect of local funding. Rather, it widens the gap between property-poor and property-wealthy districts. This widening parallels the situation we considered in *Gannon I* when the legislature failed to appropriate any money to equalize capital outlay expenditures. In finding an Article 6 violation, we used the Wichita school district as an example, noting it stood to lose approximately $4.3 million in equalization aid. We noted: "Once payments have stopped, it logically follows that the inequity the equalization aid was originally designed to cure remains present." *Gannon I*, 298 Kan. at 1179. While mathematical precision was not necessary, "we readily conclude[d] the inequity resulting from the withholding of all the capital outlay equalization funding fails our test, *i.e.*, nonpayment creates—or perhaps returns the qualifying districts to—an unreasonable, wealth-based inequity." 298 Kan. at 1181.

Certainly, the scope of the financial loss being considered in *Gannon I* was larger than presented here. Nevertheless, losses of up to $2 million of aid in a year are not inconsequential for the impacted districts. And, regardless of the amount of loss, the legal principles are the same: S.B. 19 withholds some equalization funds, and this lookback provision therefore affects only property-poor districts. Meanwhile, the inequity the aid was designed to cure remains at least partially in place. See *Gannon I*, 298 Kan. at 1179. These property-poor districts have made the same tax effort as property-rich districts but have significantly less money to spend for that effort. See *Gannon II*, 303 Kan. at 719.

As such, S.B. 19, § 17(b) exacerbates wealth-based disparities and violates Article 6 because "[s]chool districts must have reasonably equal access to substantially similar educational opportunity through similar tax effort." *Gannon I*, 298 Kan. at 1175. In other words, the State has failed to meet its burden of establishing that section 17(b) complies with the equity standard contained in that Article. See *Gannon IV*, 305 Kan. at 856.

ISSUE 5: *The State has not met its burden of establishing that school districts have reasonably equal access to substantially similar educational opportunity through the at-risk funding procedures in S.B. 19.*

Finally, the plaintiffs complain about a new alternative under S.B. 19, § 23(a)(3) for calculating the funds a school district will receive for at-risk students. Most districts will continue to receive at-risk funds for those students federally eligible for free meals, *i.e.*, the free meal proxy. But S.B. 19 adds a new feature:  a floor for this weighting.

Under this new provision, if fewer than 10% of a district's students qualify for free meals, the district will nevertheless receive the at-risk weighting as if 10% of its students qualified. L. 2017, ch. 95, § 23(a)(3). According to projections, only two districts benefit from this provision:  U.S.D. 229 (Blue Valley) and U.S.D. 232 (De Soto)—and together they will receive more than $2 million in additional funding because of the 10% floor.

To support the new provision, the State cites testimony during a May 18, 2017, hearing before the Senate Select Committee on Education Finance. Mark Desetti from the Kansas National Education Association (KNEA) submitted testimony that the 10% floor "addresses the fact that while funding is generated by poverty, at-risk programs are not exclusively for students in poverty. Districts [with] a low percentage of students in poverty still need funding to address the needs of their at-risk population."

In addition, the State points to the legislative record which includes a letter from Dodie Wellshear, a representative of U.S.D. 229 (Blue Valley), to the Senate Select Committee on Education Finance. In her letter, Wellshear indicated she was writing to "add clarity to the number of at-risk students within our schools vs. the number of students who qualify for free lunch, the proxy used to determine at-risk funding." Her letter went on to state that in the 2015-2016 school year Blue Valley had 4,346 students

73

identified under that district's standard as "at-risk," but it only received funding for 1,250 students based on the free-meal proxy.

The Committee's minutes from May 19 set out the numbers from Wellshear's letter and added: "[Wellshear's] perception is that free lunch qualification is a good proxy for most districts when measuring underperforming students but fails to work as effectively for districts with extremely low numbers of free lunch students." Wellshear's letter, however, did not address how the free-meal proxy worked in other districts.

Nevertheless, the State also calls attention to other testimony presented to the Committee that indicated the free-meal proxy works in most districts. Specifically, Dr. G.A. Buie, Executive Director of the United School Administrators of Kansas, testified that using "free lunch as a proxy for under-performing students . . . was accurate to within 6-7% on average."

The plaintiffs respond that "[a]llowing two districts to pocket $2 million to educate at-risk kids they do not have is a clear equity violation." They insist the weighting favors wealthy districts and disadvantages poorer districts, even though, in the 2015-2016 school year, there were 39,662 students statewide who did not qualify for free meals yet still performed below grade level on the math assessments. This amounts to 15.82% of all the students underperforming in this subject, and *no* district received at-risk funding for them.

In the past, the legislature has addressed the need to provide funding for such students, *i.e.*, those who scored below the level of proficiency on state reading or math assessments but who did not qualify for the free-meal program. From 2006 until 2014, the school finance formula included a "nonproficient" at-risk weighting for them. See L. 2014, ch. 93, § 67 (effective July 1, 2014); K.S.A. 2006 Supp. 72-6454. This weighting, which benefited all districts, contrasts with the 10% floor that, in effect, benefits only

74

those two districts where a proportionately high number of students live in households with income levels above the free-meal qualifications test. In other words, this provision of S.B. 19 uses a wealth-based standard. We considered a similar wealth-based weighting in *Montoy III*, 279 Kan. 817. There, we held a cost-of-living weighting, which tended to benefit wealthier districts, had a disequalizing effect. 279 Kan. at 835. The same rationale and conclusion apply here.

The State fails to meet its equity burden in another respect. It has not shown its work, *i.e.*, shown a justification for its legislative decision that demonstrates why the result of remedial legislation is equitable. *Gannon II*, 303 Kan. at 743; *Gannon III*, 304 Kan. at 515. In sum, we cannot discern from the legislative record how the legislature determined that a 10% cutoff could be justified, *e.g.*, from an actual cost basis—both as to the districts that benefit from this alternative calculation and as to those that may be excluded despite the costs of educating underperforming students who do not qualify for the free-meal program. We have repeatedly held that "actual costs remain a valid factor to be considered." *Gannon IV*, 305 Kan. at 895; *Gannon I*, 298 Kan. at 1170. While these statements were made in the context of adequacy, actual costs also play a role in assessing structural issues that influence equity.

A $2 million equity issue might be tolerable if overall funding were adequate. See *Gannon IV*, 305 Kan. at 901 ("Certainly, funding levels would not warrant much scrutiny if student achievement across the demographic landscape were demonstrably high."). But it is more troublesome when the overall dollars are inadequate and when information about actual costs has not been provided—and perhaps not legislatively considered. On the record before us, the State has failed to meet its burden of establishing that S.B. 19, § 23 complies with the equity standard of Article 6. See *Gannon IV*, 305 Kan. at 856.

MISCELLANEOUS

At the outset, we stated that we were limiting our determinations regarding S.B. 19 to the issues raised by the parties. We have considered the parties' remaining arguments on those issues and conclude they have no merit or are now moot.

*Remedies*

The State argues that if we should find continued constitutional infirmities, then we should maintain the path we created following its requests in *Gannon II* regarding equity and in *Gannon IV* regarding adequacy:

> "We observe that for the issue of equity the State previously asked that our remedy, if any, 'should be limited to a declaratory judgment giving the legislature an opportunity to cure any constitutional violations on its own.' *Gannon II*, 303 Kan. at 734. In its briefs and at oral arguments, the State renews that particular request on the issue of adequacy, stating that if an adequacy violation is found, this court 'should follow the same basic approach as the Panel—*i.e.*, issue a declaratory judgment with guidance for the Legislature while at the same time allowing the Legislature both the flexibility and an opportunity to revise the school finance system.'" 305 Kan. at 916.

Currently, the State further argues that we "should accept the substantial additional funding for the 2017-2018 school year as the first step in phasing in additional funding, as in *Montoy IV*, and allow the Legislature to resolve any outstanding funding issues in its 2018 legislative session."

Consistent with our practice in this case, we decline to provide a specific minimal amount to reach constitutional adequacy. To do so would exalt funding over other constitutional considerations such as equity and structure. But measured by the length of time the legislature allowed both the A & M and LPA studies to be performed, the State

76

certainly will have ample opportunity for any sufficient studies it may wish to have conducted and then legislatively considered. Those potential results, either in lieu of, or in combination with, the other financial recommendations in the record, together with the various rulings contained in today's decision, can provide the State with guidance on how to reach constitutional compliance.

In our March 2017 *Gannon IV* decision, we set forth in detail a number of factors relevant here. See, *e.g.*, 305 Kan. at 916-18. But because of the recency of that emphasis, those factors need not be repeated. Suffice it to say that in our view the Kansas K-12 public education system has been inadequately funded for far too long. Including today's decision, by our count inadequacy has been judicially declared to exist from school years 2002-2003 through 2018-2019, with the possible exception of three years of "substantial compliance" for "interim purposes." Compare *Montoy II*, 278 Kan. at 771 (inadequate beginning in 2002-2003 school year) with *Montoy IV*, 282 Kan. at 15, 24-25 (at best, inadequacy was cured three years later when this court found substantial compliance for interim purposes). See *Gannon IV*, 305 Kan. at 854, 880 (reciting panel's holding that funding was inadequate from 2008-2009 through 2014-2015, and that inadequacy was frozen by CLASS for another two years); see also 305 Kan. at 889-90 (affirming that CLASS was constitutionally inadequate for 2015-2016 and 2016-2017 school years). We decline to allow inadequacy to keep cutting its swath.

With that regrettable history in mind, while we stay the issuance of today's mandate through June 30, 2018, after that date we will not allow ourselves to be placed in the position of being complicit actors in the continuing deprivation of a constitutionally adequate and equitable education owed to hundreds of thousands of Kansas school children. Cf. *Campbell County School Dist.*, 32 P.3d at 332-33 (cited in *Gannon II*, 303 Kan. at 739). See *Gannon IV*, 305 Kan. at 919.

In the meantime, the State will have ample time and opportunity to reach constitutional compliance, whether by special legislative session, regular session, or a combination thereof. Indeed, it essentially has declared its intention to do so. "It is the purpose and intention of the legislature to provide a financing system for the education of kindergarten and grades one through 12 which provides students with the capacities set forth in K.S.A. 2016 Supp. 72-1127." L. 2017, ch. 95, § 70.

In the legislature's efforts to make good on its declared intention, we are confident the State will also continue to keep in mind that:

- In addition to its purpose and intention to provide the capacities identified in K.S.A. 2016 Supp. 72-1127, the legislature also has the constitutional duty to "make suitable provision for finance of the educational interests of the state." Kan. Const. art. 6, § 6(b).
- The Kansas Constitution leaves to the legislature a myriad of choices available to perform this constitutional duty. *Gannon I,* 298 Kan. at 1151. So there is no "specific level of funding" for adequacy and no "particular brand of equity" that is mandated.
- The State continues to bear the burden of establishing compliance with the constitutional requirements and explaining its rationales for the choices made to achieve it. *Gannon IV,* 305 Kan. at 856.
- The State would help its case by "showing its work." *Gannon II*, 303 Kan. at 743. This exercise involves considerably more than what it presented to this court in the instant appeal and in *Gannon III*. See 304 Kan. at 515. The State should identify other remedies that the legislature considered but, more important to meeting its burden, explain why it made its particular choice for reaching the constitutional standards for adequacy and equity.
- In being "mindful of the connection between equity and adequacy" when considering cures, *Gannon IV*, 305 Kan. at 917, the State should remain

78

cautious of challenges arising from an increased reliance upon LOB-generated funding (and less upon BASE-generated funding) as it seeks to make suitable provision for finance of the educational interests of the state. See *Gannon III*, 304 Kan. at 501.

After the legislature has acted, we will perform our own duty and review whether any new legislation is compliant with the people's constitution for as many times as such laws are presented to us. See *Gannon II*, 303 Kan. at 735-37 (court has the power and duty to review legislative enactments for constitutional compliance); see also *Auditor of State v. A.T. & S.F. Railroad Co.*, 6 Kan. 500, 506 (1870) ("'It is emphatically the province and duty of the judicial department to say what the law is.'") (quoting *Marbury v. Madison,* 5 U.S. [1 Cranch] 137, 177, 2 L. Ed. 60 [1803]).

Indeed, we ruled on different legislative enactments regarding Article 6 on three separate occasions over a five-month span in 2016. As set forth in *Gannon III*, 304 Kan. at 492, after the 2015 legislature passed CLASS, we held parts of it unconstitutionally inequitable on February 11, 2016. June 30 of that year was established as the date for the State to satisfactorily demonstrate that the legislature had complied with the equity requirement through remedial legislation or otherwise. *Gannon II*, 303 Kan. at 741. After the legislature responded with remedial legislation, on May 27 we held the LOB and supplemental general state aid provision to still be unconstitutionally inequitable. *Gannon III*, 304 Kan. at 492. After the governor called a special session of the legislature, it responded with additional remedial legislation on June 24 that he signed on June 27. Later that day the parties filed with this court a "Joint Stipulation of Constitutionally Equitable Compliance." Upon review, the next day, June 28, we pronounced the provision at issue to be constitutional.

But this time, the Article 6 components of both equity and adequacy are involved. Moreover, the attendant issues are much more numerous and much more complex than

79

those at stake in *Gannon II* and *Gannon III*. Each will likely require detailed, comprehensive analysis, including the nonseverability clause of S.B. 19 contained in section 47. Consequently, we will adhere to the following schedule.

No later than April 30, 2018, the parties' concurrent briefs addressing any legislative remedies of constitutional infirmities will be due in this court. Response briefs will be due May 10, and oral arguments will be conducted on May 22 at 9 a.m. The court's decision will be communicated by June 30. Exceptions to this schedule will be made to accelerate the deadlines as needed in order to consider earlier remedial legislation—created by special session or otherwise.

We retain jurisdiction over the State's appeal and stay the issuance of today's mandate until June 30, 2018.

BEIER and STEGALL, JJ., not participating.

MICHAEL J. MALONE and DAVID L. STUTZMAN, Senior Judges, assigned.[1]

\* \* \*

JOHNSON, J., concurring in part and dissenting in part: I wholeheartedly agree with the majority's opinion that the current school finance scheme is inadequate and inequitable. But I disagree with permitting the State to delay presenting us with a plan of

---

[1] **REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 113,267 vice Justice Stegall under the authority vested in the Supreme Court by K.S.A. 20-2616, and Senior Judge Stutzman was appointed to hear the same case vice Justice Beier under the authority vested in the Supreme Court by K.S.A. 20-2616.

remediation for some seven months. Instead, I would require the submission of a proposed remedy to the current unconstitutionality by the end of this year.

The majority's historical recitation belies the notion that we can expect anything other than a last-minute submission that will need revision, or at least refining, to pass constitutional muster. Moreover, the majority's observation that the legislature's provision for public school financing has been constitutionally deficient in 12 of the last 15 years serves to highlight the fact that Kansas has failed an entire generation of its children. Consequently, the legislature needs to be working continuously toward the goal of "[providing] for intellectual, educational, vocational and scientific improvement" in the state of Kansas. Kan. Const. art. 6, § 1. And we need to do what we can to avoid failing Kansas school children for yet another school year.

I understand the logistical obstacles to increasing appropriations to the districts in the middle of a school year. For instance, school boards have already negotiated teachers' salaries and published their budgets, as required by law. And on the other side, the legislature has provided for a fiscal-year budget that cannot realistically handle any significant increase in school funding without corresponding legislation to provide the money for the increase.

Nevertheless, the impracticability of effecting an increase in the amount of money actually distributed to schools prior to the start of the next fiscal year, on July 1, 2018, does not mean that a statutory scheme cannot be developed, passed, and approved by this court well in advance of that effective date. Indeed, if the legislature knew in January 2018 that its proposed school financing plan was structurally constitutional, it could devote the regular legislative session to the weighty problem of providing for the funds to constitutionally implement its plan.

Accordingly, I would not grant the legislature a respite from working on its constitutional duty to "make suitable provision for finance of the educational interests of the state." Kan. Const. art. 6, § 6(b). Rather, I would direct the State to tell us no later than the end of this year precisely how the legislature intends to fix its years-long breach of the Kansas Constitution.

ROSEN, J., joins the foregoing concurring and dissenting opinion.

* * *

BILES, J., concurring in part and dissenting in part:  I agree Senate Bill 19 fails the constitutional tests for adequacy and equity in funding Kansas public schools. See *Gannon v. State*, 298 Kan. 1107, 1170, 1175, 319 P.3d 1196 (2014) (*Gannon I*) (articulating both tests). Our court is unanimous as to those holdings but differs on the timing and scope of remedy. For my part, I agree with the majority's approach to stay the mandate on adequacy until June 30, 2018. But I dissent from allowing S.B. 19's inequitable features—those unfair to less wealthy school districts—to be operational during the 2017-18 school year. Slip op. at 4-5. I would have promptly enjoined their implementation before school district budgets were finalized.

To be sure, impatience comes naturally for all concerned in this protracted *Gannon* litigation. But for me, pique turns into intolerance when considering the State's repeated failures to get equity right. As the Vermont Supreme Court observed, "[m]oney is clearly not the only variable affecting educational opportunity, *but it is one that government can effectively equalize*." (Emphasis added.) *Brigham v. State*, 166 Vt. 246, 256, 692 A.2d 384 (1997).

"[E]quity is triggered when the legislature bestows revenue-raising authority upon school districts through a source whose value varies widely from district to district, such

82

as the local mill levy on property." *Gannon v. State*, 303 Kan. 682, 717, 368 P.3d 1024 (2016) (*Gannon II*). The test to apply is straightforward. We ask whether the legislative action at issue resulted in "reasonably equal access to substantially similar educational opportunity through similar tax effort." *Gannon I*, 298 Kan. at 1198.

The court's majority opinion—in what will now be known as *Gannon V*—plainly and correctly sets out why the challenged S.B. 19 provisions create or exacerbate unconstitutional, wealth-based funding disparities among our public schools. I join in that reasoning, even though I probably would have questioned more of S.B. 19 as to equity than plaintiffs did.

Kansas has long understood that failing to equalize sufficiently to offset disparities in tax effort or per-pupil operating expenditures makes "the educational system of the child essentially the function of, and dependent on[,] the wealth of the [school] district in which the child resides." *Caldwell v. State*, No. 50616 (Kan. 10th Jud. Dist. Ct. August 30, 1972) (determining State School Foundation Act and related finance statutes unconstitutional); see *Provance v. Shawnee Mission U.S.D. No. 512*, 231 Kan. 636, 643, 648 P.2d 710 (1982) ("The ultimate State purpose in offering a system of public schools is to provide an environment where quality education can be afforded equally to all."); see also *Montoy v. State*, 278 Kan. 769, 775, 120 P.3d 306 (2005) (*Montoy II*) (noting "equity with which the funds are distributed . . . [is a] critical factor[] for the legislature to consider in achieving a suitable formula for financing education").

And yet, as detailed in *Gannon I*, when the State decided to cut money from public education, it did not spread the pain equally across all districts. It took money from state equalization aid targeted for less wealthy school districts—those that we all know generate fewer dollars when taxing at the same rate for capital outlay and local option budget purposes. And by doing so, the State insulated wealthier school districts from those cuts, intensifying funding disparities. *Gannon I*, 298 Kan. at 1175-89.

The *Gannon I* holding on equity, of course, triggered a remedial phase during which the State going forward would have the burden to prove its future actions impacting equity "cured" constitutional infirmities rather than contributed to them. 298 Kan. at 1198-99. In other words, the State was on notice it would have to justify its future school funding decisions by demonstrating how they improved equity. But despite that, the State the next year again took equalization money from less wealthy school districts to further cut public education funding.

This time it reduced promised equalization funding mid-school year and attempted to freeze that reduction in place for the next two school years. See *Gannon II,* 303 Kan. at 685-86 (Classroom Learning Assuring Student Success Act, K.S.A. 2015 Supp. 72-6463 *et seq*., unconstitutional). This court's holding in *Gannon II* that the State failed to cure inequities was a predictable outcome given the context and plainly worded holdings from *Gannon I* and our earlier caselaw.

Undaunted, the State next took the wholly disingenuous step of more drastically reducing LOB equalization aid in 2016 under the guise of applying the capital outlay equalization formula for LOB purposes. Everyone knew this would generate far fewer aid dollars even though the LOB has a much more expansive purpose than the limited capital outlay tax. See *Gannon v. State*, 304 Kan. 490, 503-04, 372 P.3d 1181 (2016) (*Gannon III*) ("The State readily admits [its new] formula to calculate supplemental general state aid significantly reduces not only the overall LOB aid—compared to the amounts calculated under both the LOB aid formulas in the SDFQPA and in CLASS—but also the number of school districts qualifying for it."). Put simply, the State slashed equalization aid after two previous court rulings had held the State was already underfunding equalization aid. This court again was forced to strike down the new legislation. 304 Kan. at 493-94.

With S.B. 19, the State has once more succumbed to the temptation to protect the funding streams for property-wealthy districts while reducing equalization aid to less wealthy districts. This has forced us to declare the legislation unconstitutional and puts before us—once more—the question of remedy for unconstitutional, wealth-based funding disparities.

But unlike the majority, I would not permit these newly minted disparities to linger another year given these past experiences. And unlike Justices Johnson and Rosen, I am unwilling to force the more complex questions on adequacy by requiring an end-of-the-year plan. Slip op. at 80-81. The immediate focus should be to achieve fairness for all Kansas school children regardless of where they live.

This means I can indulge the State with another chance to figure out adequate funding levels that are reasonably calculated to align with the constitutional test for adequacy. See *Gannon I*, 298 Kan. at 1170. And if the State begins in earnest now, experience suggests this can succeed. See generally *U.S.D. No. 229 v. State*, 256 Kan. 232, 885 P.2d 1170 (1994) (detailing state work beginning in October 1991 to carefully design a school funding formula enacted in 1992 that was successfully defended against constitutional challenges); see also *U.S.D. No. 229 v. State*, No. 92 CV 1099 (Kan. 3d Jud. Dist. Ct. December 16, 1993) (considering the historical data presented by parties as justification for legislative action, as well as information from other states, statistical analysis commonly applicable to school finance issues, and expert and lay testimony to determine School District Finance and Quality Performance Act's constitutionality).

But the equity side of this litigation is different and curable now, so the prospect of tolerating unconstitutional wealth-based inequity at this juncture is too much. The State has long understood equity's importance in public school finance. I would not let S.B. 19 go unaltered for the 2017-2018 school year. Our previous history guides my thinking about remedy as well.

In *Gannon I*, with three months left in the school year, we stayed our ruling to give the legislature time to enact constitutional remedies for the then-upcoming 2014-15 school year. See *Gannon I*, 298 Kan. at 1197-99 (holding it was unconstitutional to withhold capital outlay equalization aid to less wealthy school districts and prorate and reduce their LOB equalization aid). Similarly, in *Gannon II*, after again finding fault with revised capital outlay and LOB equalization provisions, we stayed the effect until the then-upcoming 2016-2017 school year. See *Gannon II*, 303 Kan. at 712, 720, 741 ("[A] majority of the court agrees with the State that the legislature should be given another, albeit shortened, opportunity to develop a constitutional school funding system."). Yet again in *Gannon III*, after holding LOB equalization provisions were unfair, we stayed the mandate so the appropriate remedy could be in place for the still-upcoming 2016-2017 school year. See *Gannon III*, 304 Kan. at 516, 527-28. And we did this in *Gannon III* recognizing the State would have only one month to remedy the equity violations before the beginning of the new fiscal year.

In each of these instances, up to and excepting the present, an approved remedy was operational before the next school year. And in the case of *Gannon III*, a special legislative session convened to meet the deadline.

In *Gannon IV*, the precursor to where we are today, we again stayed the ruling until June 30, 2017, for the purpose of having a constitutional remedy this coming 2017-2018 school year. See *Gannon v. State*, 305 Kan. 850, 919, 390 P.3d 461 (2017) (*Gannon IV*) ("This history, coupled with CLASS's long-scheduled expiration on June 30, 2017, promotes confidence that the State can reach compliance with the adequacy requirements of Article 6 by that date, *i.e.*, the end of the 2016-2017 school year."). But with S.B. 19's enactment as the State's response to *Gannon IV*, the current proceedings came in a more chronologically jammed posture. The governor only signed S.B. 19 into law on June 15, 2017. The parties' briefing and oral arguments were not completed until July 18—after

86

the 2018 fiscal year commenced. School district budgets needed to be finalized mid-to-late August. Time was more compressed for all concerned, and the adequacy question loomed large.

Nevertheless, the inequities in S.B. 19 were obvious from the outset, as the majority decision details. That being so, I would have issued a summary opinion shortly after oral arguments enjoining the equity offending provisions for the 2017-2018 school year.

Admittedly, this would have been a little messy given the time crunch and the domino effect on the legislation resulting from such an order. Enjoining the new provision that calculates equalization aid on the preceding year's LOB, L. 2017, ch. 95, §17(b), would have forced a special legislative session. This is because of the adverse effect of the injunction on LOB revenue for all school districts and the resulting impact that would have on the entire funding scheme. We outlined a similar chain reaction in *Gannon III*, 304 Kan. at 521-22 (reasoning unconstitutional LOB provision could not be severed from remainder of CLASS funding scheme because doing so along with severance of equitable LOB aid provisions would remove $1 billion in school funding). In other words, the LOB ruling would have resulted in the need to declare the new Kansas School Equity and Enhancement Act null and void in its entirety.

But ordering equity relief now would have mirrored how we treated the unconstitutional LOB provision in 2016, and the legislative fix could have been relatively simple—just sticking to the previously approved LOB statutory language, *i.e.*, the "safe harbor" for equity. See K.S.A. 2014 Supp. 72-6434; L. 2016, ch. 1, § 2 (Special Session). Plaintiffs estimate this would have added $16 million to school funding, but it would have been extra money targeted where fairness dictated it is needed—the less wealthy districts. As for the remaining three unconstitutionally inequitable provisions, they would

have needed to be repealed or acceptably replaced. And repeal would have been a more certain fix as to them given the time constraint.

If the State would have done this much, it would be in a better position to repair the adequacy problems by June 30, 2018, as ordered by the court. And I would add that unlike Justices Johnson and Rosen, I do not see this time as a period of respite. Adequacy is not going to be determined simply by spending levels. *Gannon I*, 298 Kan. at 1172 ("[R]egardless of the source or amount of funding, total spending is not the touchstone for adequacy."). The student achievement issues that the district court found are related to funding are most likely not going to improve just by adding money to the system. And the State will need to justify why its new school funding formula will comply with our constitution.

In my view, the term "reasonably calculated" should be the focus. It requires a purposeful means for identifying the funding required given the constitutional infirmities at issue. That in turn will arm the State with the information to explain to the court why the State's preferred level of funding results in acceptable outcomes. To meet this burden, the State must convincingly show that the level of public school spending, distributed in the manner set out by the new law and coupled with any other provisions supportable as valid educational or public policy (*e.g.* incentives, accountability, efficiencies, reporting, etc.), is reasonably calculated to yield the constitutional minimums in student performance. The State has so far failed to do this.

In the meantime, it is unacceptable to tolerate even temporarily the inequities this court has today determined violate the Kansas Constitution. Accordingly, I dissent from that portion of the court's decision staying the mandate until June 30, 2018, for S.B. 19's inequitable features.

88